(December 3, 1912.)

## MELVINA L. HEAD, Appellant, v. BENJAMIN J. NIXON, Respondent.

[128 Pac. 557.]

WILL—EXECUTION—PROBATION—PROOF OF WILL—BURDEN OF PROOF—
CONTEST—VALIDITY OF SIGNATURE.

(Syllabus by the court.)

1.   Sec. 5727, Rev. Codes, prescribes the requirements in executing and attesting a will.

2.   Where the evidence introduced upon the probation of a will shows that sec. 5727 of the Rev. Codes has been complied with, such proof is sufficient to show due execution of the will, and entitles such will to be probated as the last will of the testator in the absence of a contest or a showing to the contrary.

3.   Where a contest is filed in the probate court in opposition to the probation of a will presented for probation, and upon the hearing proof is offered by the proponent of the will showing a due execution of such will, the burden of proof is upon the contestant to disprove the *prima facie* case made by the proponent, in order to defeat the probation of the will presented for probate.

4.   Where a petition for probation of a will and a contest are tried at the same time, the proponent should first present his preliminary proof in support of his petition, on which he has the burden of proof; and when other evidence is also introduced in favor of the contestant, the burden of proof then shifts to the contestant.

5.   *Held,* in this case, that the evidence shows that will Exhibit "A" was executed on January 16th in the forenoon, and a codicil attached thereto was executed on the 17th about 11 or 12 o'clock, and that will Exhibit "1" was executed on the 17th about 1:20 o'clock in the afternoon, and the later will contained a revocation of all former wills, and that such Exhibit "1" was the last will and testament of the testator, and such will Exhibit "1" is shown to have been executed in due form, and the testator was in sound mind and capable of making a will, and that undue influence was not used, or fraud shown in procuring the signature in such execution; the later will revokes the provisions of the first will and the codicil attached thereto.

6.   *Held,* that the evidence shows that the signature attached to will Exhibit "1," made on the 17th of January, 1911, was the genuine signature of the testator, S. E. Liberty, and that will Exhibit "A" does not contain the true and genuine signature of the testator.

APPEAL from the District Court of the Eighth Judicial District for Kootenai County. Hon. John M. Flynn, Judge.

Action to probate a will, and a contest of such will. Judgment for the plaintiff. *Reversed.*

James H. Frazier and C. H. Potts, for Appellant.

One relying upon the law to do a particular thing must show that he comes within the law and the prescribed regulations thereof. (*Goodwin v. Smith,* 72 Ind. 113–116, 37 Am. Rep. 144; *Savage v. Bowen,* 103 Va. 540, 49 S. E. 668; *Lewis v. Lewis,* 11 N. Y. 220; *Baskin v. Baskin,* 36 N. Y. 416.)

The request to an attesting witness must come from the testator, or be made knowingly and consciously by and with his approval and consent. (*Luper v. Werts,* 19 Or. 122, 23 Pac. 850; *Mundy v. Mundy,* 15 N. J. Eq. 290; *Vogel v. Lehritter,* 139 N. Y. 223, 34 N. E. 914.)

To "declare" means to make known, to assert to others, to show forth, to make it at the time distinctly known by some assertion or by clear assent by words or signs that the instrument being executed is testator's will. (*Remsen v. Brinckerhoff,* 26 Wend. (N. Y.) 325, 37 Am. Dec. 251; Ross on Probate, p. 36; *Lewis v. Lewis, supra; Rutherford v. Rutherford,* 1 Denio (N. Y.), 33, 43 Am. Dec. 644; *Clark v. Clark,* 64 N. J. Eq. 361, 52 Atl. 225.)

"Attestation in the testator's presence" in the code states means that the testator has a conscious personal knowledge of the act. (*Witt v. Gardiner,* 158 Ill. 176, 49 Am. St. 150, 41 N. E. 781; *Drury v. Connell,* 177 Ill. 43, 52 N. E. 368; Ross on Probate, p. 38; *International Trust Co. v. Anthony,* 45 Colo. 474, 101 Pac. 781, 22 L. R. A., N. S., 1002, 16 Ann. Cas. 1087; *Healey v. Bartlett,* 73 N. H. 110, 59 Atl. 617, 6 Ann. Cas. 413; Rood on Wills, pp. 173, 272; *Calkins v. Calkins,* 216 Ill. 458, 108 Am. St. 233, 75 N. E. 182, 1 L. R. A., N. S., 393; 4 Cyc. 888.)

The burden of proof is upon the proponents of a will to show its due execution. (*Steinkuehler v. Wempner,* 169 Ind.

154, 81 N. E. 482, 15 L. R. A., N. S., 673; *Wait v. Westfall,* 161 Ind. 648, 68 N. E. 271; *Morrell v. Morrell,* 157 Ind. 179, 60 N. E. 1092; *Goodwin v. Smith,* 72 Ind. 113, 37 Am. Rep. 144; *Williams v. Robinson,* 42 Vt. 658, 1 Am. Rep. 359; *Baskin v. Baskin, supra; Chaffee v. Baptist Miss. Convention,* 10 Paige Ch. (N. Y.) 91, 40 Am. Dec. 225; *Remsen v. Brinckerhoff, supra; Lewis v. Lewis, supra.)*

"The burden of proof, properly speaking, never shifts, but remains with the proponent throughout the case, although the burden of going forward with the evidence may shift to the contestant after the proponent has made out a *prima facie* case." (40 Cyc. 1020, II d; *Mobley v. Lyon,* 134 Ga. 125, 137 Am. St. 213, 67 S. E. 668, 19 Ann. Cas. 1004; *Delafield v. Parish,* 25 N. Y. 9; *Moriarty v. Moriarty,* 108 Mich. 249, 65 N. W. 964; *Matter of Layman,* 40 Minn. 371, 42 N. W. 286; *Norton v. Paxton,* 110 Mo. 456, 19 S. W. 807; *Beazley v. Denson,* 40 Tex. 416; *Evans v. Arnold,* 52 Ga. 169.)

Black & Wernette, for Respondent.

It is sufficient compliance with the statute when enough is said or done in the presence and with the knowledge of the testator to give the witnesses to understand distinctly that the testator desires them to know that the paper is his will and that they are to witness it. (*Mundy v. Mundy,* 2 McCart. (15 N. J. Eq.) 290; *Turnure v. Turnure,* 8 Stew. (35 N. J. Eq. 437.)

Where the attestation clause is perfect and execution appears in compliance with the statute, it requires clear proof to warrant the conclusion that the will was not duly executed. (*McCurdy v. Neall,* 42 N. J. Eq. 333, 7 Atl. 566.)

No particular form of words or set form of speech is necessary to constitute a declaration that the instrument is the testator's will. (*Bourke v. Wilson,* 38 La. Ann. 320; *Jones v. Jones,* 42 Hun (N. Y.), 563.)

Any communication, by words or otherwise, by the testator to the witnesses to a will indicating his intention to give effect

to the papers as a will is sufficient publication.   (*Doe v. Rue,* 2 Barb. (N. Y.) 203; Rood on Wills, p. 178.)

The burden of proof is on contestant to show undue influence or fraud in the procurement of the will.   (*In re Motz's Estate,* 136 Cal. 558, 69 Pac. 294; *Schuchhardt v. Schuchhardt,* 62 N. J. Eq. 710, 49 Atl. 485; *Mallow v. Walker,* 115 Iowa, 238, 91 Am. St. 158, 88 N. W. 452; *In re Latour's Estate,* 140 Cal. 414, 73 Pac. 1070, 74 Pac. 441; *In re McDermott's Estate,* 148 Cal. 43, 82 Pac. 842; *Thompson v. Bennett,* 194 Ill. 57, 162 N. E. 321; *In re Goldthorp's Estate,* 115 Iowa, 430, 88 N. W. 944.)

STEWART, C. J.—In September, 1868, at Rathdrum, Idaho, Stephen E.. Liberty, a white man, and Christina Buschey (Buchey), an Indian woman, were married.   Christina Buschey was a member of a tribe of Indians called the Coeur d'Alene tribe, and lived with such tribe.   After such marriage Liberty was adopted a member of the tribe by certain ceremonies prescribed by such tribe and appropriate to the occasion.   Mr. and Mrs. Liberty resided on the reservation a greater part of the time after their marriage, and a family of eight children was reared: Edmund A., Lee, and Warren Liberty, and Melvina L. Head, Mary Nixon, Rosilda Butler and Clara Sampson, and Hector Liberty, deceased.

On January 18, 1911, Stephen E. Liberty died in the Sacred Heart hospital at Spokane, Washington.   He left two alleged wills, one of which will be designated as Exhibit "1" and the other Exhibit "A."   On January 20, 1911, Exhibit "A" was filed for probate in the probate court of Kootenai county, Idaho, by the respondent.   A few days later Exhibit "1" was also filed in the probate court of Kootenai county for probate, and the present contest as to which was the will of Stephen E. Liberty began.   The question was presented upon the evidence introduced in support of the genuineness and validity of each will as proposed for probation.   By consent of parties a trial was had to a jury in the probate court, and the verdict of the jury was unanimous to the effect that Exhibit "1" was the last will and testament of Stephen E. Liberty,

deceased, and that Exhibit "A" was a forgery. Judgment was accordingly entered in the probate court admitting will Exhibit "1" to probate. From this judgment an appeal was taken to the district court.

In the district court a trial was had before a jury, and a verdict of eleven jurors rendered, that will Exhibit "A" was signed by the testator, and the testator declared the same to be his will, and was signed in the presence of attesting witnesses at the request of the testator, and in all things the execution of the will was in compliance with the requirements of the statute, and the last will and testament of Stephen E. Liberty, deceased, and that Exhibit "1" was a forgery.

A motion for a new trial was made by appellant and denied, and this appeal is from the judgment entered in the district court in accordance with the verdict of the jury, and also from the order denying the motion for a new trial.

Many errors were assigned in the briefs and upon the oral argument, but the entire question involved in this appeal is as to which of the two wills was the last will and testament of Stephen E. Liberty, deceased.

Will Exhibit "1" is in the usual and ordinary form of a will, and is signed and certified in the following form:

"IN TESTIMONY WHEREOF, I hereunto set my hand and seal this 17th day of January, A. D. 1911.

"Sig. of Testator—S. E. LIBERTY.

"Subscribed, Published and declared by the said Stephen E. Liberty, as and for his last will and testament in the presence of us, who at his request and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto.

"Signature—ARTHUR LIBERTY,

"Residing at ———.

"Signature—E. A. LIBERTY,

"Residing at ———.

"Signature—JAMES M. HEAD,

"Residing at ———.

"Signature—M. J. DOWD,

"Residing at ———."

The will was written upon a typewriter; the signatures of the testator and the four witnesses were written with pen and ink.

Will Exhibit "A" is in the usual and ordinary form of a will, and is signed and certified in the following form:

"IN WITNESS WHEREOF, I, the said Steven E. Liberty, have to this, my last will and testament, consisting of two (2) sheets of paper, subscribed my name and affixed my seal, this sixteenth day of January, in the year of our Lord, nineteen hundred and eleven.

"STEPHEN E. L. LIBERTY. (Seal)

"Signed, sealed, published and declared by the said Steven E. Liberty as and for this, his last will and testament, in the presence of us, who, at his request and in the presence of each other, have subscribed our name as witnesses hereto.

"BETH CHAMBERS, (Seal)

"Residence and P. O. Address, Spokane, Washington.

"ABNER Z. BOWEN, (Seal)

"Residence and P. O. Address, Spokane, Washington."

Will Exhibit "A" was typewritten, and the signatures of the testator and the two witnesses were written with pen and ink.

Will Exhibit "1" bequeaths "to my wife, Christina Liberty, my homestead in the Coeur d'Alene Indian Reservation, which I now hold a patent in fee." Other bequests are made in this will, in which provision is made that Christina Liberty should have all the household furniture, horses and wagons and harnesses and appurtenances, and all moneys "except as hereafter disposed of in this my last will and testament." Then follows a bequest to Edmund A. Liberty of $5.00; to Rosilda L. Butler, $5.00; to Melvina L. Head, $5.00; to Lee F. Liberty, $5.00; to Mary L. Nixon, $5.00; to Clara A. Sampson, $5.00; to Warren A. Liberty, $5.00. Christina Liberty is made sole executor of this will, "revoking all former wills made by me."

Will Exhibit "A" bequeaths the property involved in this case, consisting of the allotment on the Coeur d'Alene Indian Reservation, containing 170.76 acres, as follows: To Roselda

Boutlier, in trust for her child, Herod, son of Adolph and Roselda Boutlier, until he is of the age of twenty-one years, twenty acres of said allotment, the remaining 150.76 acres to be divided as nearly as practical into five equal parts of thirty acres each.    Two of such parts are bequeathed to Clara Sampson in trust for her children now living.    Three of such parts are bequeathed to Mary L. Nixon in trust for her three children now living.    Other bequests are designated in the will also, to wit: To Melvina L. Head, $1.00; to Lee Liberty, $1.00; to Edmund Liberty, 5,000 shares of the capital stock of the Boundary Creek Mining Company; to Roselda Boutlier, 5,000 shares of the capital stock of the Boundary Creek Mining Company; to Mary L. Nixon, 5,000 shares of the Boundary Creek Mining Company; to Clara Sampson, 5,000 shares of the Boundary Creek Mining Company.

It will be observed by referring to the signature attached to the respective wills, that in will Exhibit "1" the signature is "S. E. Liberty," while the signature to will Exhibit "A" is "Stephen E. L. Liberty."

Before taking up the evidence introduced in support of and against each of these wills, given in the trial court, it is proper to call attention to certain facts which appear in the record, and that there is no conflict in the evidence as to such facts.

Stephen E. Liberty and Christina Buschey Liberty lived together as husband and wife, after the marriage entered into between them, until the year 1899, and lived for several years on a ranch on the Coeur d'Alene Indian Reservation, near Desmet Mission.    An agreement of separation was made between them during that year, and a settlement was made, under the terms of which Mrs. Liberty was given the ranch, livestock and all property belonging to the pair, and she released all claim for future support.    The land in controversy in this case was acquired by Liberty as an Indian allotment in the year 1906.    This allotment was made under the act of Congress, after Liberty was adopted as a member of the tribe. After this separation it appears that the parties did not live together, except a few days at a time; that about the 10th day of January, 1911, Liberty was taken ill, and was taken to the

Sacred Heart hospital at Spokane; that Liberty notified his wife of the fact, and offered to take her to Spokane, and she refused, and stated she would not go across the street to see him.

Counsel for appellant contend that the court erred in holding that the *prima facie* case of the defendant and proponent showed due execution of the alleged will Exhibit "A," or that the entire evidence shows proper execution.

In support of this contention counsel call attention to sec. 5727 of the Rev. Codes. This section reads as follows:

"Every will, other than a nuncupative will, must be in writing, and every will, other than an olographic and a nuncupative will, must be executed and attested as follows:

"1. It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto;

"2. The subscription must be made in the presence of the attesting witnesses or be acknowledged by the testator to them, to have been made by him or by his authority;

"3. The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and

"4. There must be two attesting witnesses, each of whom must sign his name as a witness, at the end of the will, at the testator's request, and in his presence."

It is the contention of counsel for appellant that the evidence introduced with reference to the execution of Exhibit "A" does not show that this statute has been complied with, in that, first, the evidence does not show a request to the attesting witnesses by the testator; or that the request was made by the testator knowingly and consciously by and with his approval and consent; second, that "declare," as used in the statute, means to make known, to assert to others, to show forth, to make it at the time distinctly known by some assertion or by giving assent by words or signs that the instrument being executed is testator's will; third, that the attestation in the testator's presence, as used in the statute, means that the testator have a conscious present knowledge of the act.

These several objections will be considered together, as they all are based upon the section referred to.

The attestation attached to the will and signed by the subscribing witnesses seems to state the substance of this section of the statute, and on its face shows due execution in accordance with the requirements of sec. 5727.

Chap. 2, Rev. Codes, p. 340, entitled "Of the Probate of Wills," provides for the filing of the petition, for the probate of the will, and what such petition shall state. Notice is also required, as provided in said chapter, and sec. 5305 provides for contests. In sec. 5308, the procedure in a contest of a will is provided for, and a jury trial is authorized. Then follow other provisions for witnesses. There is, however, no provision in the statute to which our attention has been called, and we have found none by investigation, which prescribes the evidence required upon a hearing of a contest of a will, except the general rule, which applies to all actions brought in a court having jurisdiction, that the facts alleged in the pleadings are true. This would be, in the present instance, the introduction of evidence which *prima facie* shows due execution of the will, in accordance with sec. 5727. The evidence on this question does show that Exhibit "A," and also the codicil attached thereto, were signed by "Stephen E. L. Liberty" in the presence of Abner F. Bowen and Beth Chambers, and in the presence and hearing of testator Miss Chambers, the nurse, was informed by Bowen that Liberty wanted her to witness the will; that both Miss Chambers and Mr. Bowen saw the testator sign the will and also the codicil, and subscribed their names thereto in the presence of the testator, and in the presence of each other; and that after the conclusion of the signing, the will and codicil thereto were shown to the testator, who then said, "That is all right."

A witness by the name of Durant testified that after the execution of the will he visited the testator, and had a conversation with him about a will, and the testator said: "Well, I tell you about the will; look up in the drawer and you will find paper," and pointed to a drawer in a piece of furniture, and said: "It is a will; I won't keep it from you, but I don't

want it known.'' The witness testified that he read the will, and that Exhibit ''A'' sounds like the one he read, and that it was signed at that time, and that the signature is Liberty's; that he had known the testator for twenty years. This witness goes into detail about the reading of the will and the contents of it, and the discussion he had.

Miss Chambers, one of the witnesses, testified that she saw Liberty sign the will; that it was signed on the 16th of January, in the room, in her presence. Mr. Bowen was present. Bowen signed first, and Miss Chambers signed second; that the testator was lying in bed; and the codicil—that was signed by Mr. Bowen in her presence; she saw Liberty sign it; he said the will was all right. Mr. Bowen said Mr. Liberty wanted her to sign the will as a witness, and this was in the presence of Liberty, and after that she signed the will as a witness.

This statute prescribes no particular form of words or any specific form of phraseology in which the declarations must be couched. Underhill on the Law of Wills, vol. 1, sec. 203, announces the rule as follows: ''Any statement or communication by the testator to the witnesses at the time of execution, by means of which he informs them that the instrument which he has signed and which he requests them to attest is his will, is sufficient. The publication of a will required under a statute which provides that the testator shall declare a will in the presence of witnesses may be performed by any utterance or action proceeding from the testator, or from another by his request or direction, and in his presence, by which the witnesses are informed that the paper which they see is the will of the testator, and they are required to witness it as such.'' This text is followed by the citation of many authorities, and in our judgment states the correct and fair application of the statute involved in this case. See, also, Ross on Probate, p. 36; *Baskin v. Baskin*, 36 N. Y. 416, 419. This latter case is particularly applicable to the facts of this case.

In this case the evidence shows that Bowen was the scrivener who drew up the will, and after it was drawn in the testator's room, and ready for signing, Bowen went out into the hall and

secured Beth Chambers to be an attesting witness to the will, and that he did so at the request of Liberty, and when Miss Chambers came into the room she was informed of the fact that Liberty wanted her to act as a witness. This shows clearly that Liberty made the request through Bowen to Miss Chambers, and that after Miss Chambers came in the conversations above alluded to took place with reference to the will.

The evidence above recited clearly establishes a *prima facie* case in support of the proper execution of Exhibit "A." The evidence clearly proves, first, that the testator himself subscribed at the end of the will his name; second, that the signing of said will was made in the presence of attesting witnesses and acknowledged by the testator to have been made by him; third, that the testator, at the time of subscribing the will, declared to the attesting witnesses that the instrument was his will; fourth, that the testator, at the time of subscribing to the will, declared to the attesting witnesses that the instrument was his will, and that the two attesting witnesses who signed as such were requested by the testator at the time they signed as such witnesses to do so, and in the testator's presence.

The rule of law, as we understand it, in a case of this kind, with reference to the burden of proof, is, that where a will is presented to the probate court for probation, upon proper petition, the burden of proof is upon the proponent to present proof showing due execution of the will, in accordance with sec. 5727. That being true, in the present case the burden of proof was upon the respondent to show at the trial that Exhibit "A" was properly executed in accordance with the statute. When that proof was offered, the respondent was entitled, under the law and the facts, to have such will probated, unless the entire evidence, including the evidence introduced by the contestant and proponent, disproves the evidence offered by the proponent in support of the probation of the will. Upon this issue, the burden of proof would shift to the contestant.

In the case of *In re Latour's Estate,* 140 Cal. 414, 73 Pac. 1070, 74 Pac. 441, the supreme court of California had under consideration this identical question, and the court in the syllabus said:

"1. On a contest of a will before probate, the proponent's petition and the contest form independent proceedings, which are not responsive to each other.

"2. Where a petition for probate of a will and a contest are tried at the same time, the proponent should first present his preliminary proof in support of his petition, on which he has the burden of proof, which, if sustained, requires the contestant to introduce proof to establish the contest."

This rule was also announced in the case of *In re McDermot's Estate,* 148 Cal. 43, 82 Pac. 842.

The evidence is very voluminous, and includes not only the evidence offered in proving a *prima facie* case upon the probate of each will, but also evidence for and against the validity of Exhibit "1" and Exhibit "A." Evidence of witnesses who were familiar with the signature of the testator was given, and expert witnesses testified as to the genuineness of the signature of the testator to each one of the exhibits. Many documents, letters, notes and other papers were introduced and shown genuine, were admitted as evidence and considered as evidence in order to determine which of the signatures of the respective wills was the genuine signature.

Will Exhibit "1" is shown to have been executed at 1:20 P. M., January 17, 1911, in the presence of Melvina L. Head, a daughter, Edmund Liberty, a son, M. J. Dowd, a nephew, Arthur Liberty, a nephew, and James M. Head, a son in law, the last four of whom signed the will as attesting witnesses.

The will marked Exhibit "A" was executed on January 16, 1911, and the codicil was signed January 17th, at about 12 o'clock, in the presence of Abner Z. Bowen, a lawyer, and Beth Chambers, a nurse.

It appears that Liberty's relations with Ben and Mary Nixon were of the most friendly character, and that for a long period of time after the separation between himself and

his wife he spent a great portion of his time and made his home with them. His relations with Melvina Head were not as intimate and friendly as those manifested to Mary Nixon, his daughter. His relations, however, with his daughters Clara and Mary seem to have been friendly, and it also appears that a few days before the wills were made he sent for his wife to come to Spokane, where he was located, and she declined to do so.

It also appears that about January 8, 1911, Abner Z. Bowen, a lawyer, went to Tekoa to see Liberty about some business, and found him sick, and did not discuss the business, and on the 13th he received a letter from Mary L. Nixon stating that her father was ill in the hospital, and asked Bowen to call and see him. The next day Bowen called in the afternoon. On the 15th Bowen called at the hospital in response to the request of Liberty, and Liberty asked Bowen, "if he made a will, if he got well he could destroy it." Some data was taken by Bowen, and the will Exhibit "A" was prepared and brought to the hospital on the 16th, and signed, and attested by Bowen and Chambers, as heretofore referred to. After this will was executed on the 16th the codicil was signed on the 17th, and just after the codicil had been executed Ben and Mary Nixon came to the hospital to see Liberty, and while there Liberty, the testator, told them that Bowen had been there that day, and Elston would be there to-morrow, and he would make a will. These parties were unknown to the Nixons. The testator told the Nixons at that time the division of the property he intended to make, and the statement made was in accord with Exhibit "1." It also appears that just after the execution of the codicil to will Exhibit "A," Ben and Mary Nixon came to see the testator, and at that time were introduced to Bowen. When Bowen left he took the will with him, and on the way out of the building Ed. Liberty stopped Bowen, and on being told that a will had been made, asked leave to see it. This was refused, unless the testator consented. Bowen left the hospital.

Melvina L. Head was present in the hospital when Ed. Liberty was informed by Bowen that the testator had made a

will. This was the first time that she had heard of the will. She left the hospital and went to the hotel and saw her husband, and went back to the hospital and the room of her father, and told him that Bowen had declined to let Ed. see the will, and claimed that her father then said he would make a new will, leaving everything to the mother, and instructed her to have it drawn at once. A meeting was then arranged, and the testator gave instructions for the making of a new will, and will Exhibit "1" was prepared, and arrangement was made to meet at the testator's room at 1 o'clock, and the will was executed at 1:20. In this connection it is proper to observe that will Exhibit "A" was executed on the 16th and the codicil on the 17th, and that will Exhibit "1" was executed on the 17th and after the codicil of Exhibit "A" was executed.

It is argued that the living apart of Liberty and his wife should be accepted, under the facts of this case, as proof, or that it justified the presumption, that it was not his intention to bequeath to his wife any of his property. It must be remembered in this connection that the land involved in this case was allotted to the testator by reason of the fact that he became the husband of an Indian woman, and that he was afterward admitted into the tribe and allowed the right granted to the Indian tribes under the laws of the United States; and that during the period the testator and his wife were not living together they did visit each other and occasionally met; and that a few days before the wills were made he sent word for his wife, while he was sick in bed in the hospital, to come to Spokane, that he wanted to see her, and she declined. No doubt the testator called to mind his former marriage relation with this woman, and the obligations and duties he owed her, and because of that he desired to talk with her about the disposition of the property secured by him by allotment. She failed to come and see him. Notwithstanding this fact, the provision in will Exhibit "1" is clear evidence that the testator made such bequests in accordance with his intentions and feelings and desires, and this intention is not overcome by living apart as above indicated.

In will Exhibit "1" we find the following provision:

"First: Being of sound and disposing mind and memory do make, publish and declare this my last will and testament, hereby revoking all former wills by me at any time made as to my worldly estate and all the property, real or personal or mixed of which I die seized and possessed or to which I shall be entitled at the time of my decease. . . . .

"Nine. I hereby appoint Christina Liberty the sole executor of this will, *revoking all former wills made by me.*"

It will be seen that will Exhibit "1" contains a revocation clause which is specific and revokes all former wills. In vol. 30, Am. & Eng. Ency. of Law, p. 624, the author announces the rule as to the effect of the revoking clause in a subsequent will: "A duly executed will may operate as a revocation of a prior testamentary instrument by reason either of an express clause of revocation, or of an inconsistent disposition of the previously devised property." Under this general statement the author cites many decisions from the supreme court of the United States and the supreme courts of many states.

In Underhill on Wills, vol. 1, sec. 249, the author, referring to the same subject, says: "The revocation clause must show a present and actual intention to revoke. The language of the testator need not be absolute in its character, effecting a revocation *at all events.* He may revoke conditionally if he shall observe the proper formalities of execution. Thus, where he said, 'It is my intention . . . . to alter the above will, or rather to make another will; . . . . If I should die before another will is made, I desire that the foregoing be considered as revoked,' it was held a revocation by words of present intention showing that the will was to be revoked at all events, and that testator desired to die intestate if he did not execute another will."

In sec. 248 the same author says: "The fact that a testator makes a complete disposition of his property in a will containing an express revocation clause precludes any necessity for employing the latter to overturn a former will, for the provisions of the former will are annulled by the inconsistent provisions of the latter." Exhibit "A" comes clearly within

the rule announced above, for the language used in subd. 9 of will Exhibit "1" shows a clear intent of the testator to revoke all former wills. The revocation also appears, in that the disposition of the devised property in the two wills is inconsistent.

In Exhibit "A" the land in controversy in this case, to wit, the allotment, is devised to Rosilda Boutlier, for her child Herod, son of Adolph and Rosilda Boutlier, and to Clara Sampson in trust for her children now living, and to Mary L. Nixon in trust for her three children now living. And Mary L. Nixon is bequeathed a buggy, and all the private records, papers, letters, etc., of the testator. It is also provided in said will that bequest is made to Mary L. Head of $1.00; to the son Lee Liberty, $1.00; to Edmund Liberty, 5,000 shares of the capital stock of a mining company; to Rosilda Boutlier, 5,000 shares of the capital stock of a mining company; to Mary L. Nixon, 5,000 shares of the capital stock of a mining company; to Clara Sampson, 5,000 shares of a mining company.

Will Exhibit "1" disposes of the property of the testator by bequeathing to the testator's wife, Christina Liberty, all household furniture, horses, wagons and their appurtenances, "all monies, and my homestead in the Coeur d'Alene Indian Reservation, which I now hold a patent in fee." Then follow several gifts of five dollars each to Edmund A. Liberty, Rosilda L. Butler, Melvina L. Head, Lee F. Liberty, Mary N. Nixon. Clara Sampson and Warren A. Liberty.

These various provisions clearly show a complete matured testamentary intention of the testator as regards the disposition of his property, and that such provisions are wholly inconsistent with the provisions of Exhibit "A."

Underhill on Wills, sec. 251, announces the rule of revocation as follows: "But generally the question of the revoking effect of a will or codicil arises where the testamentary disposition in the codicil is inconsistent with that in the former will. The general rule is that, if two or more wills, or a will and one or more codicils, executed at different times, are found in the possession of the testator at his death, the pro-

visions of the later will or codicils will prevail over those of the former, but only so far as they are inconsistent and irreconcilable with them. The latest will or codicil is presumed to express the completely matured testamentary intentions of the testator as regards the disposition of his property; and so far as it cannot be reconciled with the writings which precede it, they must give way."

There is another fact which is proven in this case, which to our minds is conclusive in establishing which will is genuine, and that is the signature of the testator attached to each of the two wills. It is shown by notes, checks, letters, documents and other papers signed by the testator, and such signature is not questioned and is shown to be his signature, covering a period of many years prior to his death, that this signature is the same as the signature to Exhibit "1." The signature written on these notes, checks, letters and documents is the same signature and written by the same person as in Exhibit "1." To our minds this conclusively shows the signature to Exhibit "1" is genuine. The signature signed to Exhibit "A" is not verified by the introduction of any signatures shown to have been genuine and made by S. E. Liberty or Stephen E. Liberty to any paper, document or other writing at any time during his life. In fact, the signature to Exhibit "A" is dissimilar, and cannot be so identified under any rule recognized in determining the genuineness of handwriting.

We therefore conclude in this case that will Exhibit "1" is a revocation of will Exhibit "A." This later will, Exhibit "1," as shown by the evidence, was executed without any undue influence or fraud, and it was executed in accord with the intentions of the testator, and executed and signed in compliance with the statutes of the state, and was the completed, matured testamentary intentions of the testator as regards the disposition of his property.

In view of the foregoing conclusions, the judgment in this case must be reversed. From the evidence, as shown in the record, we are satisfied that a judgment should be rendered in accordance therewith, and that will Exhibit "1" should be held to be the genuine and last will of S. E. Liberty, the tes-

tator.   We do not direct such a judgment, in view of the fact that the parties may possibly have other evidence they would desire to introduce upon a new trial.   If such evidence, however, is not available, then such judgment should be entered. Costs awarded to the appellant.

Ailshie and Sullivan, JJ., concur.