366 P.2d 831

In the Matter of the ESTATE of Araminta Schmadeka GOAN, a/k/a Araminta Schmadeka.

In the Matter of the ESTATE of Araminta SCHMADEKA, Deceased.

Myrtle CHASE, Iva Curtis, Cassie Dennison, Everett Schmadeka, Clyde Schmadeka, Elsie Meyer, Thelma Workman and Sadie Keeler, Contestants, Plaintiff, and Respondents,

Frank Hartzel SCHMADEKA, Proponent, Defendant and Appellant,

and

Arthur Schmadeka, Non-appearing Defendant.

No. 8906.

Supreme Court of Idaho.

Dec. 5, 1961.

Cox, Ware, Stellmon & O'Connell, Lewiston, for appellants.

W. C. MacGregor, Jr., Grangeville, Paul C. Keeton, Lewiston, for respondent.

McFADDEN, Justice.

Frank Hartzell Schmadeka, a son of Araminta Schmadeka (also known as Goan), petitioned to have his mother's will admitted to probate. Mrs. Schmadeka, a widow, died April 3, 1959. The presented will, dated "April ——— 1953", but actually executed April 6 of that year, left to petitioner his mother's interest in 160 acres of land, left the residue of the estate equally to nine of her ten children, one daughter being left nothing.

Respondents, eight of Mrs. Schmadeka's children, contested the probate of the will. One other son did not participate in this will contest. Respondents by their pleadings contended that the alleged will was not executed by their mother, that she was incompetent at the time of its alleged execution, and that she was subject to the undue influence, duress or fraud of appellant, referred to as Hartzell Schmadeka.

Proceedings in the Probate Court resulted in a jury verdict rejecting the will. Appellant appealed to the District Court, and the matter was again heard by a jury. Again the will was rejected, this time for the reason that Mrs. Schmadeka was incompetent at the time of its execution.

In the District Court proceedings interrogatories were submitted to the jury on three issues: First, was deceased competent to make and execute a will at the time it was executed? Second, did she duly execute it, knowing it to be a will, in the presence of two subscribing witnesses? Third, was she subjected to the undue influence of her son, the appellant, which resulted in the execution of this will by her? The jury answered the first interrogatory in the negative, i. e., that the decedent, at the time, was not competent to make and execute the will. They did not answer the other interrogatories, having been instructed by the court that if the interrogatory was answered in the negative they need answer no more. Judgment was entered on the verdict, and appellant moved for a new trial. The motion was denied and this appeal was taken from the judgment and from the order denying the motion for new trial.

While appellant has set out some seventeen assignments of error, both parties recognize that the principal question for this court is the sufficiency of the evidence to sustain the jury's finding of incompetency. In considering this question a brief review of the testimony of the respective witnesses is essential.

Appellant testified under statutory cross-examination that his mother had suffered from high blood pressure for several years prior to 1953, but that she was "pretty good" at the time of the execution of the will and was able to handle her own business.

Sadie Keeler, a daughter, and one of respondents, testified that she had seen her mother weekly during the years after 1954; that prior to 1948 her mother's health wasn't good, and it deteriorated more between 1949 and 1953; that in 1953 it was very bad, especially after the death of her brother Roy in 1952, when her mother suffered a relapse and suffered from shingles.

Dr. Soltman, and Dr. Pullen, each testified that in his opinion Mrs. Schmadeka had for many years suffered from both high blood pressure and arteriosclerosis.

Dr. Soltman, who attended Mrs. Schmadeka for a few months before her decease in 1959, and for a short period in 1954, thought that in 1954 she appeared reasonably alert for her age. Dr. Pullen recognized that even a person suffering from high blood pressure could be perfectly rational at times, for reasonable periods of time, and that such a person would be able to think and act normally, and be able to transact business. He, in his answer to a hypothetical question, stated that the fact a person wrote a number of checks to pay bills would indicate such person was lucid enough to care for small business matters, and that letters showing a grasp of current events would indicate lucid intervals.

Myrtle Chase, another daughter and a respondent, testified as to her mother's high blood pressure and gradual weakening between 1948 and 1954; that her mother became very feeble after the death of Roy, and had headaches much of the time. She testified to her mother signing numerous checks between October 2, 1954, and December 12, 1955, in payment of ordinary bills.

Dale Eimers, the person named as executor of the proposed will, testified he had been called to consult with Mrs. Schmadeka in 1957 to ascertain her wishes as to certain property; that at that time, she appeared to be in a state of confusion and bewilderment and appeared emotionally upset; that he opened an envelope containing the will in question, and read this will to her. Mrs. Schmadeka appeared upset, as there was no provision made for the one daughter, who was left nothing and she stated to him she wanted her children to share in the estate. Mrs. Schmadeka advised him she wanted to take some time to think over certain changes she might wish to make in the will, but even though he had subsequently seen her a couple of times, she never mentioned the will again.

George W. Mires, a son-in-law of decedent, testified that in 1957 Mrs. Schmadeka had told him of a will providing equally for all the children.

In essence, the most favorable view of the evidence presented by the respondents indicates that (1) the testatrix, a woman of 81 years at the time of the purported execution of the will, was suffering from high blood pressure, at least from 1948, and from hardening of the arteries, at least since 1953, and that these diseases were the cause of her death in 1959; (2) that these conditions can, and when of long standing usually do, result in some degree of mental impairment; (3) when there is such impairment, there may also be lucid intervals of considerable duration; and (4) the testatrix did demonstrate some mental impairment at times relatively re-

mote from the time of the purported execution of the will.

■ Is such evidence sufficient to sustain a finding of incompetency? We think not. Respondents, being contestants of the will on the basis of incompetency of the testatrix, are the plaintiffs in such contest (I.C. § 15–213), and as such must sustain the burden of proof of their affirmative claim.

■ This court in In re Heazle's Estate, 74 Idaho 72, 76, 257 P.2d 556, 558, reiterated the general rule that testamentary capacity is a question of fact to be determined on the evidence in the individual case, and quoted from 1 Page on Wills, Life Ed. § 132, p. 268, it recognizing the general rule:

" 'Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them.' "

Generally the question of the mental capacity of a decedent is a question of fact. The verdict and findings in a will contest will not be disturbed when there is any substantial evidence to support the finding.

Estate of Brown, 61 Idaho 320, 101 P.2d 11. However, this court is not bound by such verdict when it is not supported by the evidence. Bussell v. Barry, 61 Idaho 216, 102 P.2d 276; In re Odberg's Estate, 67 Idaho 447, 182 P.2d 945.

Nowhere in the records considered most favorably for respondents do facts appear sustaining their contention that Mrs. Schmadeka was incompetent at the time that the purported will was executed. The most that can be said is that an inference arises from her illness and age that in the years subsequent to 1953, she was less alert; from this inference, respondents assert that it must be further inferred that decedent was incompetent at the time of the execution of the will. Such is insufficient to sustain respondents' burden of proof or the verdict. See: McMaster v. Warner, 44 Idaho 544, 258 P. 547; Hargis v. Paulsen, 30 Idaho 571, 166 P. 264; Splinter v. City of Nampa, 74 Idaho 1, 256 P.2d 215; Nordick v. Sorensen, 81 Idaho 117, 338 P.2d 766.

■■ The jury failed to decide the issue of whether the testatrix had duly executed the will, knowing it to be a will. When a will is presented for probate, proponent has the burden of coming forward with proof that the will was duly executed in accordance with the statute.

When such proof has been offered and a prima facie case has been made, the con-

testants' then have the burden of proving that the will had not been duly executed, and the proponent is entitled to have the will probated unless the preponderance of the evidence disproves that the will was properly executed in accordance with the statute. I.C. § 15–213; Head v. Nixon, 22 Idaho 765, 128 P. 557; See also Hull v. Cartin, 61 Idaho 578, 105 P.2d 196; 76 A.L.R. 380. Here, appellant presented the testimony of the attesting witnesses to the will, all showing that the testatrix had duly executed the will, knowing it to be a will. No finding having been made on this issue, it is necessary the case be reversed to have this issue resolved.

▮ Assignment of Error No. 5 claims prejudicial error in the trial court's rejection of appellant's exhibit 13, being a petition for leave to intervene in another action between the parties. This other action concerned the validity of a deed (respondent's exhibit 4 herein) from Mrs. Schmadeka to appellant. The offered exhibit contained sworn statements by decedent confirming and ratifying her action in deeding this property to her son Hartzell and was offered as relevant to the decedent's mind at the time of the execution of the will and on the issue of undue influence. The offer of the exhibit was denied by the court as it had not been included in the pre-trial order as one of the exhibits and had not been submitted to opposing counsel prior to trial. The pre-trial order, after listing exhibits considered, stated:

"If other exhibits are to be offered and their necessity reasonably can be anticipated, they will be submitted to opposing counsel a reasonable time prior to the trial."

This case being remanded for new trial, error if any in the premises may be obviated by proper submission of the proposed exhibit prior to trial.

▮ Assignments of error are predicated on the admission of certain testimony of Dr. Soltman and of certain hospital records pertaining to the decedent. It is urged that the documentary evidence was too remote in time. Such objection goes only to the weight or credibility of such evidence and is without merit, for if the evidence is otherwise admissible the weight to be given or credibility of the evidence is generally for the trier of the facts.

▮ The other ground of objection to the admission of the doctor's testimony and the hospital records is based on the claimed confidential status of such evidence. I.C. § 9–203 provides in part:

"4. A physician or surgeon can not, without the consent of his patient, be examined in a civil action as to any information acquired in attending the patient which was necessary to

enable him to prescribe or act for the patient."

In the instant case, appellant refused to grant such waiver. This court in Sprouse v. Magee, 46 Idaho 622, 269 P. 993, a wrongful death action, held that heirs could waive the privilege. In Marker v. McCue, 50 Idaho 462, 297 P. 401, a will contest case, it was held that an executor could waive such a privilege. Even though the latter case is subject to criticism (Bell, "Handbook of Evidence for the Idaho Lawyer", Chap. 4, pg. 79), it, with the case of Sprouse v. Magee, supra, is indicative of the philosophy of the court in admitting such evidence. At common law no privilege between the physician and patient was recognized, Sprouse v. Magee, supra; 97 C.J.S. Witnesses § 293, p. 823, 58 Am.Jur. Witnesses § 401, p. 232. Many courts, including this court (Sprouse v. Magee, supra), have considered that the testimony of the physician can be elicited only upon grant of a waiver, and that upon death of the patient such right to waive passes to those properly regarded as standing in his place or representing him. See: Annotation, 31 A.L.R. 167, 126 A.L.R. 380.

The question is presented here whether it takes unanimity of all the heirs, or the executor and all the heirs to waive the privilege afforded to decedent by the statute. Gorman v. Hickey, 145 Kan. 54, 64 P.2d 587, a will contest case held that unanimity of attitude as between the heirs and the executor in this situation was not required. Language appearing in that case is persuasive:

"In the instant case the question is squarely presented whether there must be unanimity of attitude among heirs and personal representative to effect a waiver of the privilege. In the solution of this question it is useless to consult decisions of those jurisdictions which hold that it cannot be waived at all, or of those which hold that only the personal representative (meaning the executor or administrator) can waive it, or of those where for the purpose of such waiver the executor or administrator is held not to be such personal representative. But in those jurisdictions like our own, which hold that either heirs or personal representatives may waive the privilege, it is clear that unanimity is not required; nor indeed could it reasonably be expected, since it is the duty of the executor to uphold a prima facie valid will and at the same time it is the right of heirs to contest its validity on the ground that the testator was lacking in testamentary capacity." Gorman v. Hickey, 145 Kan. 54, 64 P.2d 587–593.

It having previously been held by this court that the privilege may be waived by the personal representative and by the

heirs, it is only reasonable that anyone claiming through the decedent, personal representative, or some, but not all, of the heirs may waive this privilege. 8 Wigmore Evidence (McNaughton, Rev.1961) § 2391, p. 865. Appellant's specifications of error directed to admission of this evidence are without merit.

Other of appellant's specifications of error have been considered and found to be without merit.

The cause is reversed and remanded for new trial on the issues of execution of the will and of undue influence.

Costs to appellant.

SMITH and KNUDSON, JJ., concur.

McQUADE, Justice (concurring specially).

Waiver of the statutory impediment which precludes a physician from testifying without consent of his patient has been the subject of considerable discussion among the courts. Additional confusion has been raised concerning the admissibility of the physician's testimony after death of the patient.

This Court, in Sprouse v. Magee, 46 Idaho 622, 269 P. 993, inferentially adopted the rule that the privilege under our statute continued after death of the patient, and could be waived by heirs of the deceased.

The privileged communication between physician and patient was not known at the common law, and is purely a creature of statute. 97 C.J.S. Witnesses § 293, p. 823; 8 Wigmore on Evidence, McNaughton Revision, sec. 2380, p. 818.

This being a statutory exclusion, we must refer to the Idaho statute to determine the extent of the privilege. I.C. § 9–203(4). Argument in support of the privilege was to encourage confidence in the patient that any disclosure of the patient's problems would be treated confidentially, and to encourage many persons to accept medical aid who would otherwise refrain from receiving treatment. Nearly all of the considerations advanced in support of the privilege relate to the establishment of confidence of the patient during his lifetime that disclosure would not be made of personal information divulged for the sole purpose of receiving medical aid. Some courts, including Idaho, have permitted an exception to what is considered the majority rule by permitting heirs or others to waive the privilege in the patient's stead. 8 Wigmore on Evidence, McNaughton Revision, sec. 2380a, generally criticizes survival of the privilege after the patient's death.

Having in mind that no privilege existed at common law and the privilege is personal to the patient, we should then look to the statute to see if it expressly continues the privilege after demise of the

patient. The statute contemplates waiver by the patient himself, and upon death of the patient such permission becomes impossible. The statute thereupon becomes inoperative, and no longer binds the physician or surgeon to the privilege.

It does not appear that our legislators contemplated a continuation of the privilege subsequent to death. Cases concerning testators' mental capabilities, such as herein, are frequent, and elongation of the privilege provides opportunities to evade disclosure of pertinent facts in appropriate contests. This statute should not be extended by the Court to prohibit pertinent disclosure after a patient's death of information gained by a physician or surgeon during the decedent's lifetime.

8 Wigmore on Evidence, McNaughton Revision, sec. 2380a, p. 831, states:

"It is certain that the practical employment of the privilege has come to mean little but the suppression of useful truth—truth which ought to be disclosed and would never be suppressed for the sake of any inherent repugnancy in the medical facts involved. Ninety-nine per cent of the litigation in which the privilege is invoked consists of three classes of cases—actions on policies of life insurance where the deceased's misrep-resentations of his health are involved, actions for corporal injuries where the extent of the plaintiff's injury is at issue, and testamentary actions where the testator's mental capacity is disputed. In all of these the medical testimony is absolutely needed for the purpose of learning the truth. In none of them is there any reason for the party to conceal the facts, except as a tactical maneuver in litigation. In the first two of these, the advancement of fraudulent claims is notoriously common; nor do the culpable methods of some insurers or carriers, whatever they may have been or still are, justify the infliction of retaliatory penalties, indirectly and indiscriminately, by means of an unsound rule for the suppression of truth. In none of these cases need there be any fear that the absence of the privilege will subjectively hinder people from consulting physicians freely. The actually injured person would still seek medical aid, the honest insured would still submit to medical examination, and the testator would still summon physicians to his cure."

TAYLOR, C. J., concurs in this special concurrence.