[No. 23420. Department One. November 5, 1931.]

*In the Matter of the Estate of* W. R. THOMAS, *Deceased.*[1]

[1]Reported in 4 P. (2d) 837.

*Stephen E. Chaffee,* for appellants.

*Short & Short* and *E. E. Wager,* for respondents.

PARKER, J.—This is a will contest. The purported last will of W. R. Thomas was admitted to probate *ex parte,* in common form, in the superior court for Kittitas county, as provided by our statutes.

Wilburn Thomas, a son of the deceased, also named in the will as a devisee, timely filed in that court, in the probate proceeding, his petition alleging, in substance, that, at the time of the making of the will, the deceased was not mentally competent to make a will; and accordingly prayed that the will and the probate thereof be revoked and set aside. This petition was answered jointly by Philip Lawrence, named in the will as executor, and several of the children of the deceased named in the will as devisees. Thus the issue was made as to the competency of the deceased to make a will at the time in question.

The contest proceeded to trial in the superior court, resulting in findings and judgment of that court revoking and setting aside the will and the probate thereof, upon the ground alleged in the contest petition of Wilburn Thomas. From this judgment, the answering executor and devisees have appealed to this court.

During a period of many years immediately prior to his death, the deceased lived continuously upon his cattle ranch in Kittitas county, in this state, some ten miles distant from the city of Ellensburg. He had acquired about three thousand acres of land, mostly foothill grazing land, and had also acquired about seven hundred head of cattle. He had been twice married, one child being the fruit of his first marriage and

44

eight children being the fruit of his second marriage. One child, Veta, of his second marriage died about the year 1918. The other eight children are now living. They are all of age.

None of them, other than Wilburn, has, during several years past, lived upon the ranch with the deceased for any considerable period. The deceased and Wilburn lived upon the ranch practically alone, save as to hired farm help, for some ten years immediately prior to the death of the deceased. They did not have a housekeeper, but did their own cooking and housekeeping work, though Wilburn's work was, for the most part, outside assisting in the care of the cattle. Some of the other brothers were there occasionally during that period, but we think the evidence shows not in the sense that any of them were making their home there.

On January 9, 1931, the deceased became seventy-five years old. On February 9, 1931, he had, while cooking dinner at the ranch, a paralytic stroke, rendering him helpless. Wilburn was then present. He immediately called one of his brothers, who was then at the ranch, but not in the house, and together they took the deceased to the hospital at Ellensburg, where he remained until he died some seven weeks later.

The will here in question was signed by the deceased at the hospital on March 7, 1931, the day it purports to have been made. It was prepared by Mr. Chaffee, an attorney. It names Philip Lawrence as executor without bonds, giving to him large discretionary powers incident to the settlement of the estate looking to final distribution of the remaining property after the payment of the debts of the deceased and the expenses of administration. Such remaining property is therein disposed of as follows:

"(3) I give and bequeath unto my son Wilburn, who has assisted me with cattle and farming operations

more than my other children, the sum of $500, the same to be in full payment for all services rendered prior to this date, and I instruct my executor herein named to pay him said sum in full payment for all wages and claims against my estate of every name and nature, said payment to be made as soon as sufficient funds shall come into my executor's hands and upon my son signing a receipt acknowledging full payment of all claims against my estate, save and except the bequest hereinafter made.

''(4) In the event my son Wilburn shall refuse to accept the sum of $500 in full payment for all claims against my estate, it is my will that he shall receive no portion of my estate. In the event any of my children shall file any claim against my estate of any name or nature, that the child or children who shall file such claim or claims shall receive no portion of my estate. I have made this provision after careful consideration, feeling that each of my children should receive an equal share of my estate, save and except the $500 additional to Wilburn that I have provided for in the third paragraph of this my will.

''(5) In the event my son Wilburn shall accept the sum of $500 in full settlement of all claims against my estate, and in the event that none of my children shall file any claim or claims against my estate, then and in that event I give, bequeath and devise all the rest, residue and remainder of my estate, real, personal and mixed, wheresoever situate, to my children Gertrude, Wilburn, Harry, James, Howard, Veta and Emma, to be divided equally between them, share and share alike, and in the event any of said children shall die prior to my death, leaving lawful issue him or her surviving, then and in that event I give and bequeath the parent's share to his or her surviving lawful issue.

''(6) In the event my son Wilburn shall not accept the sum of $500 in full payment for all services rendered prior to this date, or in the event he shall file a claim against my estate, then and in that event I give and devise the one-seventh of my estate that I have devised to him to his brothers and sisters who shall file no claim against my estate. In the event any of my children shall file a claim or claims against my estate,

then and in that event I give and devise the one-seventh that I have devised to such child as shall file a claim or claims against my estate to his or her brothers and sisters who shall not file any claim against my estate."

This will fails to refer to two of the living children of the deceased in any manner, notwithstanding the deceased therein expresses the "feeling that each of my children should receive an equal share of my estate, save and except the $500 additional to Wilburn." It rather plainly evidences his belief that he had only seven children. It names the deceased child, Veta, as a beneficiary therein. Mr. Chaffee, according to his testimony, learned of the names of the children of the deceased directly from the deceased himself just before he prepared the will. Mr. Chaffee also informs us by his testimony that,

"I stepped to Mr. Thomas' bed and spoke to him a few minutes. Then I very carefully read this will to him. He said, 'That is the way I want it; that is all right.'"

On March 27, 1931, the deceased died in the hospital at Ellensburg, where he had remained at all times since being brought there by his sons on February 9, 1931. Wilburn was then thirty-three years old, so he had lived with the deceased and helped run the ranch for a period of some ten years after becoming of age. He claims unpaid compensation therefor in excess of five hundred dollars. Thus appears his pecuniary interest in the setting aside of the will. The pecuniary interest of the other children contestees is to the contrary, by reason of Wilburn's claim.

■ Aside from the testimony of the two physicians who attended the deceased during the whole period while he was in the hospital, the evidence is in conflict as to his mental condition during that period.

However, these outstanding facts seem to us to be proven apart from the physicians' testimony. The deceased was very materially weakened mentally during the whole of that period. During the larger part of that period, he thought he was not at the hospital, but elsewhere, vigorously so insisting a number of times to those attending him and visiting him. During that period, he failed to recognize several of his old-time and intimate acquaintances and friends upon their visiting him at different times. During most of that period, his talk evidenced a wandering of his mind and an inability to concentrate his thoughts, especially touching business affairs.

The conflict in the evidence, apart from the testimony of the physicians, is rather more in the opinions of the several witnesses as to the mental condition of the deceased than as to what he actually said or did. This conflict is rather more marked in the testimony of witnesses having some interest in the outcome of the contest.

Several of the long-time acquaintances of the deceased having no interest in the outcome of the contest, who visited him several times at the hospital, expressed their opinion in their testimony, in substance, that he was not mentally capable of doing any business or intelligently making his wishes known. Two of these witnesses visited him on the day he made this purported will. Two nurses, witnesses, one the day nurse and the other the night nurse, who attended the deceased during nearly all of the period he was in the hospital, expressed in their testimony opposing opinions as to the extent of the impairment of the mental competency of the deceased during that period. The superintendent of the hospital, who often saw the deceased while he was at the hospital, in his testimony expressed rather strong opinion that the deceased was

wholly mentally incompetent, at least during a large portion of the time he was at the hospital.

We now turn to the testimony of the two physicians attending the deceased while he was at the hospital. We quote from the abstract of the testimony made by counsel for appellant contestees. Dr. Richardson testified as follows:

"I reside in Ellensburg, I am a physician and surgeon, have been practicing fourteen years, ten years in Ellensburg. Have a clinic, Dr. Taylor, Hicks, and myself. Dr. Taylor and myself have a controlling interest in the Ellensburg General Hospital. Knew W. R. Thomas. He was confined in the hospital in February and up to his death in March. I was associate with Dr. Taylor in his treatment. Usually saw him twice a day, once or twice a day. Cerebral hemorrhage was his original trouble. . . . Was in his room once or twice a day, usually there wasn't much conversation. At times I believe he did realize he was in the hospital. At first he did not. He would be just as likely to talk about one thing as another; usually rather incoherent. In my opinion the man at no time when I saw him was capable of transacting any legal business; capable of transacting no business in which any money was involved. His mental condition was the result of the physical condition. In that way, treatment of the physical condition would probably influence the mental condition had he ultimately lived. That cerebral condition produced a partial paralysis."

Dr. Taylor testified as follows:

"I am a practicing physician and surgeon, I have been in that profession about twenty-two years. I am associated in the clinic with Dr. Richardson. You might say that Doctor Richardson and I control the Ellensburg Hospital, yes. I knew W. R. Thomas. I knew him off and on for fifteen or eighteen years, he was in the hospital during February and March until his death, I saw him in the hospital every day, and sometimes twice a day. . . . Q. Take it as a whole during the time he was in the hospital, was he at any

time mentally competent to transact business in your opinion? A. Not of his own that would require any amount of mental work. Q. What was the state of his mentality from time to time? A. That would vary; part of the time unconscious, part of the time he rambled, . . . Q. What do you mean by transact business of his own accord? . . . A. He wasn't in mental condition that he could get out, make a deal and carry it through without assistance. Q. Was his mentality such he would be unable to comprehend any business deal he was in? A. Yes, without some assistance; he would have to be told what he was expected to do. . . . A great part of the time he didn't understand what was put up to him. . . . Q. I ask you whether or not his mental condition was such during the period he was there that in your judgment he would not be able to transact any business— . . . A. Not competent.''

The cross-examination of Dr. Taylor in some measure discloses that his testimony above quoted is not wholly consistent with a prior expressed view made by him as to the mental condition of the deceased. These doctors are apparently wholly disinterested witnesses. Theirs is the only medical testimony in the case. Their testimony was admitted over the objection of counsel for the appellant contestees, upon the ground that the information acquired by them as to the mental condition of the deceased was, in legal effect, of that privileged character with reference to which they should not be permitted to testify in the absence of consent of the deceased. This question we shall presently notice.

Viewing the testimony as a whole, including the doctors' testimony, we cannot say that it fails to sustain the decision of the trial court.

Should the testimony of Doctors Richardson and Taylor be excluded from the consideration of this contest? Counsel for appellants so contend, invoking

in support thereof Rem. Comp Stat., § 1214, subd. 4, reading as follows:

"A regular physician or surgeon shall not, without the consent of his patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him to prescribe for the patient."

It is argued in behalf of appellants that the consent must, under all conditions, be by the patient personally, and that, when he dies without having given his consent, the lips of his physician are forever closed. It is argued in behalf of respondent that any of the personal representatives of the deceased, that is, administrator, executor or heir, may effectually waive the privilege accorded by this statute, as the deceased patient could do in his lifetime, when the testimony of the physician is sought to be introduced in a will contest touching the mental condition of the deceased patient to make the will the validity of which is drawn in question; and that the respondent, being the son and heir of the deceased, could, as an heir representative of the deceased, effectually waive the privilege, and has effectually done so by offering and introducing the testimony of Doctors Richardson and Taylor in this contest.

There is conflict in the decisions of the courts of this country upon this subject, but we think the decided weight of authority and better reason support the contention here made in behalf of respondent.

It seems to us that there is a close analogy between this statutory privilege of a physician's patient and the similar common law privilege of an attorney's client, and that we may, at the beginning of our inquiry, profitably notice the common law touching the power of a representative of a deceased client of an attorney to effectually waive the privilege. In the

much cited case of *In re Layman's Will,* 40 Minn. 371, 42 N. W. 286, the principal question was as to the mental capacity of a deceased client of an attorney to make the will in question, and the right of one of the heirs to waive the privilege and have the attorney testify touching his dealings with the client and his client's mental capacity to make the will. Holding the testimony of the attorney to be admissible, Justice Collins, speaking for the court, said:

"These communications between the decedent and his attorney were privileged at common law as well as by statute, the object of the rule being the protection of the client and his estate. And while many textwriters assert emphatically that the seal of secrecy remains forever, unless removed by the party himself, there is an abundance of authority for saying that, upon the decease of the only person who could, in his lifetime, exercise the privilege of waiver, the rule should not be so perverted by a strict adherence to it as to render it inconsistent with its object, and thus bring it into direct conflict with the reason upon which it is founded. *Russell v. Jackson,* 15 Jur. 1117; *Blackburn v. Crawfords,* 3 Wall. 175; *Groll v. Tower,* 85 Mo. 249. The object of the rule, so far as it relates to this class of communications, being the protection of the estate, there remains no reason for continuing it when the very foundation upon which it proceeds is wanting. The testimony called for was quite necessary in order to determine the weight which ought to be given the witness' opinion as to the mental condition of the testator, and his disclosures in no way reflected upon the character or reputation of the deceased. The testimony when given served to protect the estate, and tended to aid in a proper disposition of it. The issue in the case was as to the mental soundness of a person under whom each litigant claimed, and, whatever the result, the interest and the estate of the deceased were not prejudicially affected. It is not an action in which the success of an adverse third party must prove detrimental to the property. Neither of these litigants can be permitted to invoke the rule respecting privileged

communications for the purpose of excluding material and important evidence of the character above described upon the only question involved in the dispute, namely, the sanity of the deceased. The testimony of the witness Laing was properly received."

The statute there referred to is not quoted in the opinion, but it was treated by the court as a mere statutory declaration of the common law rule.

In *Brooks v. Holden,* 175 Mass. 137, 55 N. E. 802, the privilege was held to be waived by the administrator as the representative of the deceased client of an attorney, and the attorney permitted to testify touching communications made to him by the deceased. Justice Barker, speaking for the court in so holding, observed:

"To allow the executor or administrator of the deceased client to waive the privilege and to call the attorney to testify as to a privileged communication in a suit involving the client's estate no more militates against the principle of public policy involved than to allow the client himself to waive the privilege. Nor does it tend to weaken the protection which the rule gives for the benefit of the client as an individual. The executor or administrator acts with reference to the question of waiver as the personal representative of the deceased client, and solely in the interest of his estate. While it has been said that on such facts the mouth of the attorney shall be forever sealed, and that the seal of the law once fixed upon such communications remains forever, unless removed by the party himself, in whose favor it was there placed, we know of no decided case in which it has been held that upon the death of the client his personal representative cannot waive the privilege and call upon the attorney to testify in behalf of the client's estate."

*Glover v. Patten,* 165 U. S. 394, was a matter commenced by a bill in equity in the trial court of the District of Columbia, seeking construction of the will of Mrs. Patten. Touching the admission of testimony of her attorney concerning statements made to him by her

shedding light upon her intention in the making of the will, Justice Brown, speaking for the supreme court, said:

". . . we are of opinion that, in a suit between devisees under a will, statements made by the deceased to counsel respecting the execution of the will, or other similar document, are not privileged. While such communications might be privileged, if offered by third persons to establish claims against an estate, they are not within the reason of the rule requiring their exclusion, when the contest is between the heirs or next of kin. . . .

"In *Russell v. Jackson,* 9 Hare 387, 392, the contest was between the heirs-at-law and a devisee. The heirs claimed that the devise was upon a trust, unexpressed, because illegal. It was held that a solicitor, by whom the will was drawn, should be allowed to testify what was said by the testator contemporaneously upon the subject. Vice-Chancellor Turner, in delivering the opinion of the court, observed: 'In the cases of testamentary dispositions, the very foundation on which the rule proceeds seems to be wanting; and in the absence, therefore, of any illegal purpose entertained by the testator, there does not appear to be any ground for applying it. . . . That the privilege does not in all cases terminate with the death of the party, I entertain no doubt. That it belongs equally to parties claiming under the client as against parties claiming adversely to him, I entertain as little doubt; but it does not, I think, therefore follow that it belongs to the executor as against the next of kin, and in such a case as the present. In the one case the question is, whether the property belongs to the client or his estate, and the rule may well apply for the protection of the client's interests. In the other case the question is, to which of two parties claiming under the client the property in equity belongs, and it would seem to be a mere arbitrary rule to hold that it belongs to one of them rather than to the other' . . .

"The same rule has been applied in several cases in the state courts: *Layman's Will,* 40 Minnesota, 371; *Scott v. Harris,* 113 Illinois, 447; *Graham v. O'Fallon,*

4 Missouri, 338; Wharton on Evidence, § 591; *Goddard v. Gardner*, 28 Connecticut, 172; Weeks on Attorneys, § 165.''

The case of *In re Le Prohon*, 102 Me. 455, 67 Atl. 317, was a will contest, particularly as to whether or not the testator had effectually revoked her will, it having been physically mutilated; but as to whether or not she mutilated it or caused it to be mutilated, became a proper subject of proof by oral evidence. Holding that her attorney was properly admitted to testify as to her statements made to him bearing upon that question, Justice Spear, speaking for the supreme judicial court, said:

''This testimony, if admissible, was important and material. The ground of its exclusion was that the interview was in the nature of a privileged communication of the decedent to Mr. Bradbury as an attorney. We think the ruling is wrong.

''Were it conceded, although it is now unnecessary to determine it, that the interview between the decedent and Mr. Bradbury should be held to come within the rule of privileged communications were the decedent living, it would still be admissible under the principles of law covering the right of waiver by the personal representative or heir. The question involved in the present controversy is the descent of the decedent's property. The parties to the controvery are the legatee under the mutilated will on the one side and an heir at law upon the other. The heir at law, waiving the question of privilege, offers the testimony of Mr. Bradbury in support of her contention with respect to the alleged mutilation of the will. The legatee objects on the ground only that the communication embodied in the Bradbury testimony was of a privileged character, therefore inadmissible under objection. It is a universal rule that the question of privilege, with respect to the communications offered in evidence, can be invoked only by the author of the communication. It is a personal privilege. The general principle upon which the right of privileged com-

munication rests is too well established to require reiteration.

"But in the case of persons deceased it is held that the right of waiver, when the character and reputation of the deceased are not involved, is lodged in the personal representative, that is, the executor or administrator of the estate, or the heirs of the deceased; and the ground upon which they are permitted to exercise the right of waiver is based upon the fact that they are all interested in the protection of the estate and upon the presumption that they would consent to the waiver of the privileged communication only for the purpose of securing that end."

We think that these decisions express the decided weight of authority touching waiver of the common law privilege relating to attorney and client after the death of the client.

That the privilege, as relating to attorney and client, is a common law privilege, independent of statute, though in some states expressed by statute, seems plain. 40 Cyc. 2361; 28 R. C. L. 548; Wigmore on Evidence, § 2290. That the privilege, as relating to physician and patient, is not a common law privilege, but one existing in a number of states, as in this state, solely by virtue of statute, seems equally plain. 40 Cyc. 2381; Wigmore on Evidence, § 2380; 28 R. C. L. 532. The common law privilege, as relating to attorney and client, we think, is well and tersely stated in the text of 28 R. C. L. 548, as follows:

"An attorney, counselor or solicitor is not permitted, and cannot be compelled, to testify as to communications made to him in his professional character by his client unless the client consents."

Thus, it seems plain that this common law rule, as relating to attorney and client, is, in substance, the same as our above quoted statutory rule as relating to physician and patient. If we are right in this view,

then the above noticed authorities lend strong support to the contention here made in behalf of respondent that he had the right, as a representative heir of the deceased, to waive the privilege and thus render it proper for Doctors Richardson and Taylor to testify concerning the mental condition of the deceased while they were attending him at the hospital.

Now, let us pursue our inquiry further and notice particularly decisions of the courts dealing with the statutory privilege as relating to physician and patient, and the right of waiver of the privilege by a representative of the deceased patient after his death. In the much cited case of *Thompson v. Ish*, 99 Mo. 160, 12 S. W. 510, 17 Am. St. 552, a will contest, decided in 1889, there was drawn in question the waiver of the privilege which was given by a statute of that state reading as follows:

"The following persons shall be incompetent to testify: . . . fifth, a physician or surgeon, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon."

This, it will be noticed, is, in substance, the same as our statute above quoted, save that it does not, in terms, say anything about the consent of the patient. The opinion of the court does not indicate that any statute of that state contains, in terms, any such provision. Holding that an heir of the deceased had the right to call a physician and have him testify as to the mental condition of his deceased patient, from knowledge acquired by him from attending her as such patient, the court held that the privilege could be waived by the heir representative of the deceased. Justice Black, speaking for the court, in a learned and

well considered opinion, in the light of the then existing authorities, not overlooking the New York rule, which we shall presently notice, said:

"Notwithstanding our statute provides for no exception, still it deals with a privilege, and it must be taken as established law that the privilege may be waived by the patient; and we have held that it may be waived by the representative, and, in this, our ruling accords with that of the supreme court of Michigan under a like statute. If the patient may waive this right or privilege for the purpose of protecting his rights in a litigated cause, we see no substantial reason why it may not be done by those who represent him after his death, for the purpose of protecting rights acquired under him.

"Some light may be thrown upon this question by analogy from the rules of law applied to confidential communications between client and attorney. Such communications, it is held in *Russell v. Jackson,* 9 Hare 390, must not be revealed in cases where the rights and interests of a client, or those claiming under him, come in conflict with the rights and interests of third persons; but this rule, it is held, does not apply to cases of testamentary disposition of property by the client. The disclosure in such cases, it is considered, can affect no right or interest of the client, and is therefore not within the reason of the rule. Taylor says: 'In stating that the privilege does not terminate with the death of the client, care must be taken to distinguish between cases where disputes arise between the client's representative and strangers, and those in which both of the litigating parties claim under the client.' As to the latter class of cases he says, 'it would be obviously unjust to determine that the privilege should belong to one claimant rather than the other.' 1 Taylor on Ev., sec. 928, p. 780. See also *Blackburn v. Crawfords,* 3 Wall. 175; *Scott v. Harris,* 113 Ill. 454.

"It is difficult to see why the rule of exclusion should apply in case of a physician, and not of an attorney. An attorney is declared, by the third clause of section 4017 of our statutes, to be incompetent to testify con-

cerning communications made to him 'without the consent of the client.' The clause in relation to physicians does not contain this quoted qualification; but the third clause is simply declaratory of the common law; and, if the difference between the clauses argues anything, it should be that the physician cannot testify with or without the consent of the patient. Whatever may have been the rule at common law, the statute places attorneys and physicians on substantially the same ground. We conclude, as before, that when the dispute is between the devisee and heirs at law, all claiming under the deceased, either the devisee or heirs may call the attending physician as a witness.''

In *Winters v. Winters,* 102 Ia. 53, 71 N. W. 184, 63 Am. St. 428, a will contest, we have another well-considered opinion wherein the authorities are reviewed at length. The question was presented substantially as it is here presented. Holding in harmony with the decisions above noticed, Justice Ladd, speaking for the court, made this observation:

''On the authority of *Denning v. Butcher,* 91 Iowa 425 (59 N. W. Rep. 69), this evidence, if offered by the proponent should have been received, though no executor had been appointed. Ought it to be rejected when offered by an heir at law? At common-law, confidential communications to a physician, were not privileged, and they are only so made by statute. Those to an attorney, however, were privileged, and it was held that the attorney might not divulge without the consent of the client while living, but that, after his death, in a contest between a stranger and an heir, devisee, or personal representative, the latter might waive the privilege and examine the attorney concerning the confidential communications, though the stranger was not permitted to do so; and, in a controversy between heirs at law, devisees, and personal representatives, the claim that the communication was privileged could not be urged, because, in such a case, the proceedings were not adverse to the estate, and the interest of the deceased, as well as of the estate, was, that the truth be ascertained. Hageman, Privil. Com., section 84;

*Russell v. Jackson,* 9 Hare, 387; *In re Layman's Will,*
40 Minn. 371 (42 N. W. Rep. 286); *Scott v. Harris,* 113
Ill. 451; *Doherty v. O'Callahan,* 157 Mass. 90 (31 N. E.
Rep. 726); *Blackburn v. Crawfords,* 3 Wall. 175.''

Then, after noticing the decisions holding to the contrary, Justice Ladd further said:

''The particular vice in the reasoning in these cases,
in making the distinction between the heir at law and
the devisee, is the assumption that the paper in dispute is the will of the deceased. The statutes are for
the benefit of the patient while living and of his estate
when dead. The very purpose of the contest is to determine whether the deceased in fact made a will, who
shall be his representative, and who is entitled to his
estate. If he did not have testamentary capacity, then
the paper was not his will, and it is not the policy of
the law to maintain such an instrument. It is undoubtedly the policy of the law to uphold the testamentary
disposition of property, but not until it is ascertained
whether such a disposition has been made.''

The following additional decisions all lend strong
support to these views: *Morris v. Morris,* 119 Ind. 341,
21 N. E. 918; *In re Estate of Gray,* 88 Neb. 835, 130
N. W. 746, Ann. Cas. 1912B 1037; *Bruington v. Wagoner,* 100 Kan. 10, 164 Pac. 1057; *Grieve v. Howard,*
54 Utah 225, 180 Pac. 423; *Flack v. Brewster,* 107
Kan. 63, 190 Pac. 616; *Schornick v. Schornick,* 25
Ariz. 563, 220 Pac. 397, 31 A. R. L. 159, and note at
page 167.

The leading decision out of harmony with the above
noticed decisions seems to be *Westover v. Aetna Life
Ins. Co.,* 99 N. Y. 56, 1 N. E. 104, 52 Am. Rep. 1, decided in 1885. The controlling statute of that state, as
stated in that opinion, reads as follows:

''Section 834 provides that 'a person, duly authorized to practice physic or surgery, shall not be allowed
to disclose any information which he acquired in attending a patient in a professional capacity, and which

was necessary to enable him to act in that capacity.'
. . . and section 836 provides that 'the last three
sections apply to every examination of a person as a
witness, unless the provisions thereof are expressly
waived by the person confessing, the patient or
client.' "

That statute seems somewhat stronger than ours in
its mandatory terms by the use of the words "express-
ly waived by the patient," while ours uses the words
"without the consent of the patient." This may give
some room for distinguishing that decision from those
above noticed. Such suggestions can be found in some
of the decisions. However, that decision has been fol-
lowed in *In re Flint's Estate,* 100 Cal. 391, 34 Pac. 863;
*In re Will of Hunt,* 122 Wis. 460, 100 N. W. 874; *Auld
v. Cathro,* 20 N. D. 461, 128 N. W. 1025, 32 L. R. A.
(N. S.) 71, Ann. Cas. 1913A 90; and *McCaw v. Turner,*
126 Miss. 260, 88 South. 705; each of those states hav-
ing a statute similar to our statute.

We have great respect for the New York court and
those following its lead upon this subject, but we feel
constrained to hold that the decided weight of au-
thority, both in numbers and reason, supports the con-
tention that this respondent, as the heir representative
of the deceased, had the right and the power to effectu-
ally waive the privilege in question, and did so; and
thereby rendered it proper that Doctors Richardson
and Taylor should testify as they did in this contest.

The judgment of the superior court setting aside the
will and the probate thereof is affirmed.

MITCHELL, MAIN, and BEELER, JJ., concur.

TOLMAN, C. J. (concurring in result)—It may be
that, aside from the testimony of the physicians dis-
cussed by the majority, the state of the evidence is such
that we can not say that it preponderates against the
findings of the trial court. If that be true, as I am

inclined to think it is, then I concur in the results reached by the majority.

But I can not concur in the argument or conclusion that one situated as was the contesting son in this case can waive that which is antagonistic to his position. The whole theory of waiver in the law is based upon the right of one to forego or waive something which is to his advantage or interest; and I know of no rule which permits one to waive that which is to his disadvantage, and which, if not waived, will defeat his cause.

Suppose one were suing upon a promissory note, and the defendant pleaded the statute of limitations. Could the plaintiff thereupon waive the statute and recover notwithstanding? Surely not. And yet, in legal effect, that is exactly what was attempted to be done here. In other words, one may waive his own rights only. He can not, under any circumstances, waive the rights of his opponent. I can think of no logical reason which will support the waiving by any litigant of that which, if not waived, would defeat his action or destroy his defense.

I appreciate the value of this kind of evidence in cases involving testamentary capacity, and perhaps it should be held that the statute does not apply to such cases. That is a question which I have not had time to investigate and can not now answer.

For these reasons, I can not concur in the reasoning of the majority.

## On Rehearing.

[*En Banc.* February 8, 1932.]

Per Curiam.—Upon a rehearing *En Banc,* a majority of the court adheres to the Departmental opinion heretofore filed herein.

Judgment affirmed.