No. 32,993

In the MATTER OF THE ESTATE of SOPHIA HOOPER, Deceased (F. M. PEARL, *Appellant*, v. JESSIE HATCHER, WINNIFRED HOOPER, LEON HOOPER and FRANK HOOPER, *Appellees*).

(61 P. 2d 1335)

Opinion filed November 7, 1936.

*Roy V. Nelson*, of Hiawatha, for the appellant.

*Walker F. Means*, of Hiawatha, for the appellees.

The opinion of the court was delivered by

SMITH, J.: In this action a will was offered for probate. The probate court refused to probate it. On appeal the district court also denied probation. The proponents of the will appeal from that order.

Mrs. Sophia Hooper had lived in Brown county. Her children, all of whom are concerned with this will, are Leon Hooper, Jessie Hooper, Winnifred Hooper, Frank Hooper and Ben Hooper. Ben Hooper was married to Lois Hooper, whose name we are mentioning for reasons that will presently appear.

Mrs. Hooper had lived on a farm in Brown county. In 1920 she

received $15,000 from the sale of this farm. This money was kept on deposit in the bank at Robinson, Kan. Mrs. Hooper had made her home for many years with her son, Ben, and his wife, Lois, and at the time of the making of the will in question was living with them. Her entire fortune consisted of a certificate of deposit for $6,000 and another for $3,000 in the Robinson bank. There was also some evidence of a joint bank account in the name of Sophia, Lois and Ben Hooper in which at times there had been as much as $4,000.

In 1928 Ben and Lois left Brown county and moved to California. They took Sophia with them.

On February 1, 1934, Sophia and Lois were alone together in the house in California. Sophia was past 92 years of age. She could see objects dimly, she could read the headlines of newspapers and could distinguish persons when they came into the room. She could distinguish the lines of ordinary print but could not distinguish the letters.

On the day mentioned, Sophia asked the advice of Lois about making her will. She was advised by Lois. Lois propped Sophia up in bed, procured writing materials, prepared a writing table on the bed, put the paper on it, gave Sophia the pen and kept her hand against the hand of Sophia while she wrote a letter. The letter was to F. M. Pearl, a lawyer at Hiawatha, directing him how to draw her will.

Mr. Pearl received this letter, proceeded to draw a will in accordance with the directions contained in it and forwarded it to Sophia in California. This will bequeathed to Ben Hooper the two certificates of deposit. It also contained a clause providing that in case Ben died before testatrix, leaving issue of his body, the certificates were to go to that issue, and if he left no issue then the certificates were to go to Lois. Some personal effects were then bequeathed to each of the other children. There was a residuary clause bequeathing the rest of the estate to the other children, but there was no residue. The certificates constituted the entire estate.

When the will arrived in California Lois called two witnesses who came to the bedside of Sophia and witnessed its execution. Lois propped Sophia up in bed, arranged a writing desk on the bed, put the pen in Sophia's hand, put the point down on the paper, and kept her arm around Sophia while she signed the will. Lois testified that she did not touch her hand at this time. Lois also testified that

Sophia could not read, so she read the will to her. All this occurred February 22, 1934.

In January, 1935, Lois again propped Sophia up in bed, put the paper on the table, placed the pen in her hand and told her to write. Lois guided Sophia's hand this time and she wrote to the banker at Robinson, Kan. This letter directed the banker to issue the certificates of deposit in Ben's name. Under the same circumstances Sophia endorsed the certificates. They were then enclosed in a letter and forwarded to the bank. The new certificates were then issued and forwarded to California and were received and kept by Lois.

In February, 1935, Sophia died. Her body was cremated, but her ashes were not brought to Kansas until April. Ben testified that he did not know about the drawing of the will until he learned about it when it was offered for probate in April. After opposition to the will developed Lois said, "if I had any idea that they would contest the will I would have fixed it so they couldn't have got anything."

F. M. Pearl was nominated executor in the will. On April 23, 1935, he filed a petition in the probate court for the probate of the will. The formal affidavits of the subscribing witnesses to the execution of the will were attached to the petition and introduced at the hearing.

Jessie Hatcher, whose maiden name was Jessie Hooper, and Winnifred Hooper objected to the probate of the will, and the probate court denied its admission to probate. This order was appealed to the district court.

In the district court the executor introduced the formal evidence of the execution of the will and rested. The children of Sophia who opposed the probate of the will then called witnesses for the purpose of showing that the will was written while Sophia was under restraint by Ben Hooper and Lois Hooper and was not the will of Sophia Hooper. The proponents introduced evidence about as it has been detailed here. The court made findings about as the facts have been detailed here and found in particular that while Sophia Hooper had sufficient mental capacity to make a will, she was very old and sick and was unduly influenced by her son and his wife to make the will in controversy, and that by reason thereof the same was not her will, and should not be probated. The district court denied probate. From that judgment this appeal is taken. The judgment also assessed the costs against the executor, F. M. Pearl.

The main point argued by the appellants is that this was a proceeding wherein a will was offered for probate, and the court tried it on the theory that it was a proceeding to contest a will. The argument is that the proponents of the will, when the formal proof of execution was introduced, made a prima facie case and the burden was then upon the opponents of the probate of the will to show the restraint exercised upon Sophia. Appellants urge that there was not the slightest evidence of restraint.

Since the session of the legislature of 1905 the probating of a will has been an adversary proceeding. Except for the fact that no pleadings are required there is but little difference between the trial of a proceeding where the probate of a will is being resisted and the trial of an action to contest a will. Once the trial court in its discretion permitted the opponents of the will to introduce evidence contradicting and discrediting proponents' prima facie case the court properly proceeded to try the question of mental capacity and restraint. The subject is considered in *McCarthy v. Weber*, 96 Kan. 415, 151 Pac. 1103. There this court said:

"It is true, as plaintiff contends, that ordinarily the testimony of the subscribing witnesses makes a prima facie showing of competency and validity which warrants the admission of a will to probate. Originally only an *ex parte* probate was provided for, the application being made and the witnesses called by those interested in having the will admitted to probate. (Gen. Stat. 1868, ch. 117, sec. 12.) In 1905 the section was amended making the probating of a will an adversary proceeding. Now the court is required to subpoena not only the witnesses called by persons desiring to have the will probated, but also those requested by persons opposed to the admission of the will to probate; and it is further provided that the depositions of witnesses may be taken and used in the hearing in the same manner and to the same extent as is provided in the civil code. (Laws 1905, ch. 526, sec. 1; Gen. Stat. 1909, sec. 9787.) In such a trial there is presented to the probate court for its decision the issue of the testamentary character of the paper offered, involving the competency of the testator and his freedom from restraint when the paper was executed. The amendment making the proceeding adversary did not enlarge the issues nor change the effect of the probate. In a contest an order allowing a probate is no more than prima facie evidence of the due attestation, execution and validity of the will." (p. 417.)

The court further said:

"In case rebutting evidence and discrediting circumstances are produced as against the prima facie evidence offered by the proponent of the will the probate court, or the district court on appeal, must then determine the issue the same as in any other case." (p. 418.)

Also:

"The findings of the trial court on these issues, based as they are on competent and substantial testimony, are binding on this court." (p. 418.)

R. S. 22-218 reads as follows:

"If it shall appear that such will was duly attested and executed, and that the testator at the time of executing the same was of full age and sound mind and memory, and not under any restraint, the court shall admit the will to probate."

In *Wright v. Young*, 75 Kan. 287, 89 Pac. 694, this court held:

"By the provisions of chapter 526 of the Laws of 1905 any person interested in having the application for the probate of a will denied may demand the right to have his witnesses examined in opposition; but the issues involved in the application were not changed or enlarged by the act so as to authorize a contest of the will in the probate court.

"The rule that only a prima facie showing is required to admit a will to probate was not abrogated by the act of 1905. When such prima facie showing is made it is the duty of the court to admit the will, unless for some of the reasons mentioned in section 15 of the act relating to wills (Gen. Stat. 1901, sec. 7952) the court finds conclusively from the evidence that the will should not be probated.

"The extent and scope of the inquiry in opposition to the probate rests in the discretion of the court hearing the application." (Syl. ¶¶ 1, 2, 3.)

We have concluded that there is ample authority for the court to hear whatever witnesses should be brought before it as to the testamentary capacity of the testatrix and as to any restraint being exercised upon her, and that having heard these witnesses it was the court's duty to deny the will probate if it appeared that the testatrix lacked testamentary capacity or was under restraint.

Appellant urges that the only question the court had a right to try was whether the testatrix was under restraint. It is pointed out that the court found that undue influence was exercised upon testatrix. Appellant argues that such a finding could not be made in a case of this sort. R. S. 22-218 does use the words "not under any restraint." The words do not mean that there had to be any actual physical restraint of the body of the testatrix. Restraint could be exercised in many ways. It is any action that deprives the testatrix of the free exercise of her will. In the case of a woman 92 years old, bedridden and almost blind, it would not take nearly so much evidence to establish restraint as in the case of a vigorous person in the possession of all his faculties.

Some definitions of restraint and of undue influence will be helpful. They are as follows:

"To establish undue influence over the testator . . . it must appear that the . . . influence was such as to deprive him of the free exercise of his will. . . . Undue influence is such as to impose a restraint on the will of the testator, so as to prevent him from doing what he wishes to do, or forces him to do what he does not wish to do." (*Booth v. Kitchen*, [N. Y.] 3. Redf. Sur..52, 67.)

" 'Undue influence . . . is such an influence that the instrument is not properly an expression of the will of the testator in regard to the disposition of his property, but rather an expression of the will of another person.' *In re Jackman*, 26 Wis. 104. Manifestly, it is a subtle species of fraud, whereby mastery is obtained over the mind of the victim by insidious approaches, seductive artifices, or other species of circumvention." (*Will of Slinger*, 72 Wis. 22, 26, 37 N. W. 236.)

"Undue influence is any kind of influence, either from fear, coercion or importunity, by which the testator is prevented from expressing his true mind. . . . It must of course be an influence adequate to control the free agency of a testator. . . . A testator should enjoy full liberty and freedom in making his will, and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it." (*Estate of Frederica A. Tittel* [Cal.] Myr. Prob. 12, 16.)

"Actual undue influence may consist of threats of personal harm or duress, under the force of which a person makes a testamentary disposition of his property which is really against his will. In this same category is the undue influence exerted by a strong mind over a weak one by domination, by deceit, or by constant importunity and persuasion, which the weaker mind is unable to resist. Undue influence of this type can never be presumed, but is an issue to be affirmatively established; . . . [but] the burden of establishing freedom from undue influence is cast upon the proponent . . . where the beneficiary under a will maintains some confidential relation to the deceased and where the will excludes the natural objects of the testator's bounty." (*In re Marlor's Estate*, 103 N. Y. Supp. 161, 162, 52 Misc. Rep. 262.)

"Restraint is that kind of influence which is exercised by force or threats, or coercion, physical or mental, which the testator is not able to resist, or from fear, by which the testator is prevented from exercising and expressing his own judgment and desire." (Estate of James Black [Cal.], Myr. Prob. 24, 31.)

· "To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. It must be brought to bear directly upon the testamentary act, and particular parties must be benefited or disfavored as the result of the purpose and pressure of the dominating mind." (*Ginter v. Ginter*, 79 Kan. 721, syl. ¶ 1, 101 Pac. 634.)

After an examination of the above authorities we hold that the

finding by the trial court that undue influence was exercised upon Sophia Hooper amounts to a holding that she was under restraint.

The appellants further argue that the finding of the trial court that undue influence was exercised upon Sophia Hooper was not supported by the evidence. This evidence has already been detailed here. The trial court set out much of it in the findings. To detail it further would add nothing to this opinion. Giving all the circumstances and surrounding facts the interpretation most favorable to the finding of the trial court we conclude that the finding was supported by the evidence.

The other arguments urged by appellants are not well taken.

It will be noted that the trial court taxed the costs against the executor. This should not have been done. The executor was named in the will. It was his duty to offer the will for probate. It was necessary that this should be done for the benefit of all concerned. He should not be penalized for doing his duty. The estate should pay this expense.

The judgment of the district court is modified so far as it taxes the costs against the executor, and as so modified is affirmed.