No. 33,100

FRANK GORMAN, D. J. GORMAN and JOANA GORMAN DETRICH, *Appellees*, v. PATRICK M. HICKEY, as an Individual and as Executor of the Estate of William Hickey, Deceased, *Appellant.*

(64 P. 2d 587)

Opinion filed January 23, 1937.

*C. W. Burch, B. I. Litowich, La Rue Royce, L. E. Clevenger* and *E. S. Hampton,* all of Salina, for the appellant.

*J. V. Humphrey, A. S. Humphrey,* both of Junction City, *Matt Guilfoyle* and *Thornton D. Scott,* both of Abilene, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to contest the will of the late

William Hickey of Dickinson county, a single man, who died on January 12, 1935.

His heirs were his only surviving brother, Patrick M. Hickey, of Junction City, defendant herein, and the three children of his only sister, the late Catherine Gorman, of Chapman, who prosecute this action as plaintiffs.

The late William had amassed an estate valued at over $80,000, about half in land and half in government bonds. Part of this estate had inured to him as heir of others of his family whom he had outlived.

The common ancestors of these litigants were Dennis Hickey and Bridget, his wife, who came to Dickinson county in 1869. They had seven children, Cornelius, William, John, Catherine, Patrick, and two others whose names do not appear in this record. The family had the usual pioneer habit of land acquisition, and some of them died intestate, leaving their properties to their surviving heirs. Cornelius and the two unnamed children died intestate, unmarried, and without issue prior to 1901. Dennis, the father, died in 1903. By that time the daughter Catherine had married a man named Gorman and resided on a farm near the Hickey homestead. Patrick M. Hickey, one of the sons of Dennis, married and settled in Junction City about 1900, where he has ever since engaged in business as a hardware merchant.

The mother, Bridget, and two of her sons, John and William, both of whom were single, continued to live on the original farm homestead. She died in 1916. John and William continued to farm all of the considerable Hickey lands, irrespective of which of the Hickeys held the title thereto. The title to two quarter sections stood in William's name. John Hickey died in March, 1925, and thereafter William lived alone on the family homestead until December 23, 1931, when his brother Patrick happened to call and discovered him indisposed—how seriously is a subject of dispute in this lawsuit. Patrick took William to a doctor's office in Junction City and then to a hospital, where William remained for about four months. Thereafter William made his abode with his brother Patrick until his death nearly three years later.

The day after William was taken to the hospital the will in question was made. By its terms all his property was devised to Patrick except a bequest of $100 to his sister Catherine. She then was

and for two or three years previously had been in poor health. She died on December 25, 1932.

Following the death of William, the will in controversy was admitted to probate, and this action to contest was begun. On joinder of issues the cause was tried by the court without a jury.

In summary, the evidence on plaintiffs' behalf tended to show that William had never had a normal mentality; that he was always so shy and diffident that he would go and hide when strangers, even neighbors, called at the farm home; that he practically never did business on his own responsibility but depended on other members of the family to guide and direct him, and that he invariably obeyed them implicitly. Until his brother John died, the latter had looked after William's affairs and caused them to prosper. When John died Patrick looked after William's more important affairs, such as the leasing of William's lands and signing such leases "P. M. Hickey for William Hickey." On one occasion a neighbor, George Signer, rented some land from William personally, took possession, and apparently placed some sort of house on the property. When Patrick heard of it, he ordered Signer to move. The record reads:

"Q. State what happened. A. Pat told me to move it off again.

"Q. What did he say about it? A. He said Bill wasn't capable of doing business.

"Q. Yes. And what did you do then? A. I just moved it off."

Patrick testified that such a conversation never occurred; but, of course, this court cannot discredit oral testimony to which the fact-finding tribunal, the trial court, gave credence.

The testimony for plaintiffs also tended to show that when Patrick brought his brother to the doctor's office he told the latter, Doctor Carr, that he had called at the Hickey farm that day, December 23, 1931, and had found his brother William lying on the floor by his bedside, apparently not knowing what he was about, and unable to get up alone.

At the hospital William was under the ministrations of various nurses, all of whom, as well as Doctor Carr, gave testimony in detail touching his limited intelligence, his physical and mental weakness, which testimony, if competent and given full credence, tended strongly to show that when admitted into the hospital and for many days, perhaps weeks thereafter, William was altogether lacking in testamentary capacity. It also showed his disposition to be that of an obedient child who never spoke except when spoken to.

Over objection, the Hickey family doctor, who had occasionally treated William for various ailments over a long period of time, testified that he was always met by one of the family and gave his instructions to them.

"Q. Why did you take pains to leave your directions with John or some member of the Gorman family? A. Because I did not regard his mental capacity equal to the understanding and the proper carrying out of the directions.

. . . . . . . . . . . . . .

"Q. Now what was that mental condition? A. It was one of retarded mental development, never · assuming the condition of full manhood, which, in a word, is described best by saying he was an adolescent.

. . . . . . . . . . . . . .

"Q. State whether you have heard him at any time express any sentiment or opinion upon anything. A. I never did in my life.

. . . . . . . . . . . . . .

"Q. State whether or not you formed an opinion as to his mental capacity to carry on any business transaction of any importance. A. Yes, sir.

"Q. Now you may state what that opinion is as to his mental ability to carry on any business transaction. A. Accepted in the general terms, I wouldn't regard him as capable of carrying on any business transaction.

"Q. State whether or not in your opinion he had sufficient mental capacity to understand the nature of his property and the value thereof, assuming that he had considerable property, both real and personal; what is your opinion as to whether he would have the mental capacity to comprehend his property and the nature of it and the value of it? A. I think he would not comprehend it."

Cross-examination:

"Q. Now, doctor, you said that Will had the mind of an adolescent? A. Yes, sir.

"Q. What age do you mean when you say adolescent? A. Well, in the female it will run around their time of puberty, you might say, is from eleven to twenty-one, and in the male, oh, fourteen to twenty-four.

"Q. You think that William's age, then, would be between fourteen and twenty-four years of age? A. It would come in there some place."

Typical of the testimony of the several nurses who had attended William was that of Cora Sherill, who testified by deposition that she was a nurse on night duty at the Junction City Hospital during William Hickey's confinement therein. She recalled William's arrival on December 23, 1931, and was in his room every hour that night.

"Q. Proceed to describe his condition as best you can; tell us exactly how he appeared and what he was doing, etc.

"A. When I said semiconscious, I meant that he had control of himself physically, but he didn't ask for anything, and when he was given water, he

would drink when we would give him a drink, and any care that was given him, was not asked for by him—he never asked for a thing that night.

"He was not able to walk nor feed himself. He could turn over in bed and move his arms and legs. He made no noise except a sort of moan. He did not put on his signal light for anything. He didn't ask for anything during the night. He moved around in his bed a good deal, and she watched him closely for fear he might fall out of bed."

Over the defendant's objection that it was a conclusion, a speculation, and the witness was not qualified to answer, the witness was permitted to testify that at no time during the night did William Hickey know where he was or what was going on.

The witness testified that she was a night nurse on December 24, 1931; that there was no change in Mr. Hickey's condition except that he moved around more and had more control over his body. He was not semiconscious like he was the night of December 23d. He only moved when someone would speak to him, and when he was told to move, he would do that and would know someone was in there. He was not asleep all of the time.

The witness explained that when she used the words "semiconscious condition," she meant "that he had control of his body, but had no control of his mental faculties."

"Q. Was there ever a time when William Hickey was normal mentally? . . . A. Would say, no.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. On the night of December 23d, did William Hickey remain in a semiconscious condition all night, or were there times when he had lucid intervals? . . . A. He was in a semiconscious condition all night.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Was there any time during that night that he would have known and appreciated the nature and extent of property that he owned? . . . A. No.

"Q. Was there ever a time in all of your observations of him, during that period, that he was able to understand and appreciate the nature and extent of his property? . . . A. No, there was not.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Was there ever a time in that period that in your opinion he could have transacted the simplest form of business and understand what he was doing? . . . A. I don't see how he could, when he was not able to ask for anything.

"Q. During that period, did you have occasion to ask him questions? A. Yes, regarding what he wanted to eat, and when he wanted to go to the bathroom—whether he had any pain and things of that kind."

Concerning the actual making of the will, the time, place and circumstances were narrated by the scrivener, an attorney of Junc-

tion City. He testified that late in the afternoon of the first day William was admitted into the hospital at the request of Patrick M. Hickey, whom he had known for many years, and for whom he had previously rendered professional services; he went with Patrick to the hospital. Patrick introduced him to William and left the room. William asked the attorney what the law would require him to give to his sister and said he desired his brother to have his estate. The attorney said that while it was not necessary to leave his sister anything, it was customary to leave so close a relative a dollar or five or ten dollars, some nominal sum. William mentioned $100—said he wanted Patrick to be his executor without bond, as "it would all be his anyway." After this interview the attorney returned to his law office and drew the will as instructed. On the following forenoon he asked a local magistrate, L. F. Schwartz, to accompany him to the hospital to serve as witness to the will. When they arrived the scrivener handed the will to William, who read it, expressed his approval of its terms, and signed it in the presence of the scrivener and Schwartz, and those two signed it as witnesses.

On behalf of defendants the testimony of the scrivener was that on the two occasions of his visit to the hospital, when he received his instructions as to the preparation of the will and when it was signed by William, he believed the testator knew his relatives, what property he had, and where he wanted it to go.

"Q. Do you think he knew the object of his bounty? A. I think he did; yes, sir.

"Q. Do you think he was of sound or unsound mind? A. Sound mind."

A long array of witnesses were called by defendants, some of whom had known William for many years. They testified that William was a normal man, that he talked intelligently about farming and crop prospects, that he was a shrewd judge of horses and bought and sold them advantageously to himself. After John Hickey died William continued to reside at the family homestead alone and carried on the usual farming activities. Witnesses who had been fellow patients in the hospital with William testified that they visited back and forth with him and believed his mental condition was all right. Neighbors of William, who called on him at the hospital, testified that his mental condition was good. One witness testified that on the day before William went to the hospital she and her husband divided a hay crop grown on Hickey lands. William weighed the hay.

"Q. Now what can you say from your association with William Hickey, your observation of his conduct, and your conversations with him during this period . . . as to his mental condition? A. He seemed normal to me."

However, this same witness, on cross-examination, also testified:

"During the time when they were putting up hay, Pat Hickey came to the farm quite frequently and she had heard him give directions about work to be done. She testified that she had never heard William give any directions."

The trial court made findings of fact which in substance were that William was subnormal mentally, not insane, but of inferior intellect. After his mother's death in 1916, his brother John until 1925, and his brother Patrick thereafter, took charge of and conducted William's business affairs. Each of his brothers in turn dominated William, and he was subservient and obedient to them. The findings continue thus:

"(5) . . . Every business transaction, other than a few of trifling importance, transacted on behalf of William Hickey was, since John Hickey's death, performed by Patrick M. Hickey; that by reason of said circumstances a confidential relationship existed on the 23d and 24th days of December, 1931, between William Hickey and Patrick M. Hickey, in which relationship the said Patrick M. Hickey completely dominated and controlled William Hickey. That on December 23, 1931, defendant found William Hickey at his home about twelve miles west of Junction City in a semiconscious condition on the floor unable to get up alone. Defendant thereupon brought William Hickey to the office of Doctor Carr in Junction City and Doctor Carr examined him and found him suffering from an advanced stage of arteriosclerosis, with a blood pressure of 280/120. He directed that the said William Hickey be taken to the Junction City Hospital and the said Patrick M. Hickey forthwith took him there; that at the hospital Doctor Carr reëxamined William Hickey, and because of imminent danger of his having a cerebral hemorrhage the doctor considered it advisable to bleed him in his own room without removal to the operating room, and thereupon performed an operation of blood letting upon the said William Hickey; that the said William Hickey was placed in bed in said hospital, remaining, as a result of said sickness, in said hospital continuously until May 17, 1932, and for more than two weeks remained confined to his room, very weak, physically and mentally; that on the 23d and the 24th days of December, 1931, the said William Hickey was very sick and weak, both physically and mentally, being unable, according to the opinion of Doctor Carr and five nurses who attended him, to determine and control his simplest movements and wants; that after defendant had taken William Hickey to the hospital on December 23, he employed . . . an attorney at law, and a stranger to William Hickey, to prepare a will for said William Hickey and accompanied the said [attorney] to the presence of the said William Hickey; that the said [attorney] . . . wrote said will, presented it to the said William Hickey, told him of its contents, and acted as a witness to the execution thereof, and the same Patrick M. Hickey paid

the said [attorney] his fee for said services; that the said William Hickey had no independent advice concerning said will or the matters therein contained; that his condition both physically and mentally was so weak at the time of the execution of said will that he had very limited power of volition and no resistant power against the control or domination of another; that Patrick M. Hickey was the principal beneficiary under said will.

"(6) That at the time of the signing of the will, William Hickey did not have sufficient mental capacity to know and understand the nature of his property and his relations and their respective claims upon his bounty; nor to understand the nature of the transaction involved in his execution of said will."

"The court finds, as a conclusion of law, that the pretended will of William Hickey is void and should be set aside."

Judgment was entered accordingly. Hence the appeal.

The first error pressed on our attention relates to the admission in evidence of the testimony of Dr. W. A. Carr, who treated William when his brother Patrick brought him to the doctor's office on December 23, 1931, and who attended William during his stay in the hospital. Another doctor, Dr. L. R. King, who had been the family physician of the Hickeys for more than twenty years, also gave testimony over an objection predicated on the statute R. S. 60-2805, which in part provides:

"The following persons shall be incompetent to testify:

"*Sixth.* A physician or surgeon concerning any communication made to him by his patient with reference to any physical or supposed physical disease, defect, or injury, or the time, manner or circumstances under which the ailment was incurred, or concerning any knowledge obtained by a personal examination of any such patient, without the consent of the patient."

By judicial construction this statutory privilege of the patient has been extended to his heirs; and in *Linscott v. Hughbanks,* 140 Kan. 353, 37 P. 2d 26, it was said to extend to the personal representative, although that question was not squarely involved. In *Rost v. Heyka,* 130 Kan. 5, 285 Pac. 539, the action in two counts was between sons and daughters of Frank Rost, the *first* in partition, which provoked no controversy, and the *second* which was designed to charge certain of the co-heirs with advancements made by their father. One of the litigants sought to use the testimony of physicians who had attended his father professionally, the purpose being to show his mental condition and capacity to do business. This testimony was excluded, and error was assigned thereon. This court said:

"Plaintiff contends he is the person who could insist on the privilege or waive it, because defendants were not claiming as heirs, but as donees of their father. The contention is unsound. Plaintiff brought his sisters into court to cut down their shares in the land to be partitioned, and they were defending their inheritance from their father." (p. 7.)

This court has held that the heirs of an estate can waive the privilege as against the grantee of a deed, although such grantee was also an heir but not litigating in that capacity. (*Flack v. Brewster,* 107 Kan. 63, 190 Pac. 616; *Bruington v. Wagoner,* 100 Kan. 10, 15, 164 Pac. 1057, and citations.)

Here the heirs were the plaintiffs. While Patrick M. Hickey was made a defendant individually he was not a necessary party to this action. The action was against him in his capacity as executor of the estate whose official duty required him to resist the assault on the will. (*In re Estate of Hooper,* 144 Kan. 549, 555, 61 P. 2d 1335.) In this situation, where the heirs desire to waive the privilege and the executor of the will insists on its preservation, what should be our ruling?

It must be kept in mind that it is only by judicial expansion of the terms of our statute that the privilege of the patient is accorded either to his heirs or to his personal representative; and it would close an important avenue for the judicial ascertainment of the truth to push that statutory privilege so far as to exclude the physician's testimony when the executor objects to its admission, although the heirs, his nearest blood kindred, were ready to waive it. The disclosure of intimate facts pertaining to the patient's physical or mental condition might adversely affect the sensibilities of his heirs, but it is hardly conceivable that the personal feelings of his executor or administrator could be thus affected. (*Chaffee v. Kaufman,* 113 Kan. 254, 256-257, 214 Pac. 618.) The latter is merely an official functionary charged with the care and disposition of the testator's estate. Some eminent courts are so concerned about the preservation of the testator's good name and reputation that they insist on the extension of the privilege to all controversies which may arise in litigation pertaining to the estate. So far as concerns the testamentary capacity of a testator, however, the exclusion of the testimony of the physician would not avail to keep that question out of the lawsuit. Anybody and everybody, except the physician, who has an opinion on such a question based on more or less significant and pertinent facts, may give testimony on the point.

(*Zirkle v. Leonard,* 61 Kan. 636, 60 Pac. 318; *State v. Rumble,* 81 Kan. 16, 105 Pac. 1; *Jenkins v. Jenkins,* 94 Kan. 263, 266, 146 Pac. 414; *Mingle v. Hubbard,* 131 Kan. 844, 293 Pac. 513; *Linscott v. Hughbanks,* 140 Kan. 353, syl. ¶ 1, 37 P. 2d 26.)

This court has not heretofore had to decide the identical question here presented, although we have been close to it in *Bruington v. Wagoner,* 100 Kan. 10, 164 Pac. 1057, where the action was by some of the heirs of Dr. George W. Bruington to set aside certain deeds and assignments of bank stock which purported to have been executed by him in favor of the children of his surviving sister. Plaintiffs alleged that at the time of their execution the grantor was of unsound mind and incapable of transacting business or managing his affairs. In support of their cause of action plaintiffs called as a witness Doctor Miller, the physician who attended Doctor Bruington. He testified that based upon what he had learned in his professional capacity Doctor Bruington's mental infirmities rendered him quite incapable to transact business intelligently at and about the time the challenged instruments were executed. Judgment was entered for plaintiffs, and error was assigned on the admission of Doctor Miller's testimony as being incompetent under the sixth clause of section 321 of the civil code (R. S. 60-2805). In the opinion this court said:

"Conceding the correctness of the general rule and that the evidence of Doctor Miller was a disclosure of professional communications from his patient and of knowledge of his patient obtained in a professional way, and therefore privileged, it has been held in this state that not only may the patient himself waive this privilege (*Armstrong v. Street Railway Co.,* 93 Kan. 493, 144 Pac. 847), but after the patient's death the privilege may be waived by his heirs at law (*Fish v. Poorman,* 85 Kan. 237, syl. ¶ 6, 116 Pac. 898). This is in accord with the best judicial thought in this country on this subject, and takes nothing from the effect of defendant's citations. (*Winters v. Winters,* 102 Iowa 53, 63 Am. St. Rep. 428, and note, 433; *Thompson v. Ish,* 99 Mo. 160; Note, 32 L. R. A., n. s., 73; 40 Cyc. 2397; 4 Wigmore on Evidence, §§ 2388, 2391.)

. . . . . . . . . . . . . .

"Here the plaintiffs were the heirs at law of the deceased, and they were within their rights when they waived this statutory privilege. But an argument is made as if the defendants were also his heirs at law. Not so. Their mother was alive and a witness at the trial. She was a coheir at law with the plaintiffs. It would technically be to her interest to agree with plaintiffs that the privilege be waived, but perhaps she cared more for the interest of her children, the defendants, than for her own. At all events, the only heirs at law in court as litigants waived the privilege. It should not be for-

gotten, either, that defendants were in court merely in their capacity as defendant grantees of deeds and assignments whose validity was being challenged by the heirs at law. (*Shuman v. Supreme L. K. of H.*, 110 Iowa 480.) If we had a lawsuit here between heirs at law and it should present a situation where some of them, claiming as heirs at law, desired to waive the privilege, and some of them, likewise as heirs at law, objected to waiving it, the matter might present some difficulty, although this court is rather positively committed against any interpretation of rules of evidence which limits judicial inquiry in the ascertainment of the truth. (*Armstrong v. Street Railway Co.*, 93 Kan. 493, 503, 144 Pac. 847.) These observations are only relevant now, however, as tending to show that the trial court did not err in admitting the evidence of Doctor Bruington's physician on the waiver of his heirs at law." (pp. 15, 16.)

In the instant case the question is squarely presented whether there must be unanimity among heirs and personal representative to effect a waiver of the privilege. In the solution of this question it is useless to consult decisions of those jurisdictions which hold that it cannot be waived at all, or of those which hold that only the personal representative (meaning the executor or administrator) can waive it, or of those where for the purpose of such waiver the executor or administrator is held not to be such personal representative. But in those jurisdictions like our own, which hold that either heirs or personal representatives may waive the privilege, it is clear that unanimity is not required; nor indeed could it reasonably be expected, since it is the duty of the executor to uphold a *prima facie* valid will and at the same time it is the right of heirs to contest its validity on the ground that the testator was lacking in testamentary capacity. (*In re Estate of Gray*, 88 Neb. 835, 130 N. W. 746; *Winters v. Winters*, 102 Iowa 53, 71 N. W. 184, 63 A. S. R. 428; *Marker v. McCue*, 50 Idaho 462, 297 Pac. 401; *In re Quick's Estate*, 161 Wash. 537, 297 Pac. 198; *In re Thomas' Estate*, 165 Wash. 42, 4 P. 2d 837, and citations. See, also, Note in 31 A. L. R. 167, 181-182.) This court holds that in this contest of William Hickey's will, where some of the plaintiffs as heirs desired to waive the privilege, and where the defendant as executor and individually opposed such waiver, the trial court did not err in admitting the testimony of Doctor Carr, his physician at the time the will was made, nor in admitting the testimony of Doctor King, who for many years had been the Hickey family physician.

Defendants next complain of the admission of certain testimony which related to an alleged conversation between Patrick M. Hickey and his sister, mother of plaintiffs. On cross-examination defendant

denied that such a conversation had ever occurred and later one of the plaintiffs testified that it did occur. It is now contended that this was improper rebuttal, and that plaintiffs were bound by defendant's answer. There is such a rule of trial practice, but obviously it should not extend to the exclusion of testimony to contradict that of defendant himself, whether given on his direct testimony or on cross-examination.

Error is next assigned on the admission of the evidence of the five nurses who gave testimony and opinion evidence to the general effect that the testator did not have sufficient mental capacity to make a will when he was admitted into the hospital nor at any time for several weeks thereafter. Such testimony was clearly competent under many decisions. (*Mingle v. Hubbard,* 131 Kan. 844, 851, 293 Pac. 513, and citations.)

It is next contended that the findings of fact that the testator lacked testamentary capacity and that the will was procured by undue influence were not supported by the evidence. A thorough perusal of the record does not permit us to give assent to that contention. We can go no further than to concede that the evidence adduced by defendants, if its credence had been preferred by the trial court to that adduced by the plaintiffs, and if a contrary judgment had been reached by that tribunal whose function it was to settle controversies of fact, this court would have no difficulty in following its usual appellate practice. (*Bruington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.) So far as concerns the specific finding of undue influence, that was a fair inference to be deduced from all the evidence, including the circumstances under which the scrivener was procured and paid by the principal beneficiary. In *Hoff v. Hoff,* 106 Kan. 542, 552, 189 Pac. 613, it was said:

"While it may be conceded that one who has no mind to be influenced cannot be subjected to undue influence, yet one who has a feeble mind, a defective will, a confused intelligence and deficient understanding, may be highly susceptible to influence, due or undue. . . . In 1 Jarman on Wills, 6th ed., page 66, it is said that although there is no necessary connection between undue influence and partial incapacity, they are apt to be found together. The books are full of cases where wills have been set aside for want of testamentary capacity. How came such wills to have ever been made? Undue influence or similar fraudulent wrongdoing on the part of some intermeddling self-seeker is commonly and most probably the correct explanation."

There is no prejudicial error in the record, and the judgment is affirmed.

BURCH, C. J., not sitting.